IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01265-WDM-MEH
(Consolidated with 05-cv-01344-WDM-MEH)

WEST PALM BEACH FIREFIGHTERS' PENSION FUND,
On Behalf of Itself and All Others Similarly Situated,

      Plaintiff,

v.

STARTEK, INC.,
A. EMMET STEPHENSON, JR.,
WILLIAM E. MEADE, JR.,
MICHAEL W. MORGAN,
EUGENE L. MCKENZIE, JR.,
TONI E. STEPHENSON, and
PAMELA S. OLIVER,

      Defendants.

Civil Action No. 05-cv-01344-WDM-OES
(Consolidated with 05-cv-01265-WDM-OES)

JOHN ALDEN, Individually and on behalf of All Others Similarly Situated,

      Plaintiff,

v.

STARTEK, INC.,
A. EMMET STEPHENSON, JR.,
WILLIAM E. MEADE, JR.,
MICHAEL W. MORGAN,
EUGENE L. MCKENZIE, JR.,
TONI E. STEPHENSON, and
PAMELA S. OLIVER,

      Defendants.

---

**ORDER ON MOTION TO DISMISS**

This matter comes before me on Defendants' Motion to Dismiss the Consolidated Complaint (Dkt. # 29), filed May 23, 2006 ("Defendants' Motion"). Plaintiffs filed their response ("Plaintiffs' Response") on August 11, 2006 (Dkt. # 36). Defendants filed their reply on September 11, 2006 (Dkt. # 37). The matter has been fully briefed and oral argument on the motion will not materially assist my determination.

## I. BACKGROUND

These consolidated cases, originally brought as two separate class actions on behalf of shareholders, allege securities fraud by corporate defendant StarTek, Inc. ("StarTek"), and the individual named defendants, A. Emmet Stephenson, William Meade, Michael Morgan and Eugene McKenzie, who at relevant times were officers and/or directors of StarTek, and Toni E. Stephenson and Pamela Oliver, who were major shareholders or controlled major shareholders of the company. The named plaintiffs, West Palm Beach Firefighters' Pension Fund, Wayne County Employees' Retirement System, Anthony Zigmont and Stewart L. Horn in Case No. 05-1265, and John Alden in Case No. 05-1344, allege they are shareholders who purchased or otherwise acquired StarTek common stock at "artificially inflated prices" and suffered damages when the stock price fell.

The alleged securities fraud apparently arises from a series of events that occurred between February 26, 2003 and May 5, 2005 ("the class period"), including the issuance of press releases in 2003, the filing of a registration statement in February

2004, and subsequent amendments thereto which culminated in an offering of StarTek securities for sale in June 2004, and the publication of various public statements after the offering. According to the plaintiffs, these activities concealed weak demand for the company's products and other problems, some of which ultimately came to light in March 2005 when the company announced substantial declines in its gross margins, and which resulted in a severe drop in the stock price by May 6, 2005 when the company announced a significant decline in its per share earnings. Due to the identity of the defendants, the identity of the claims alleged in the initially filed complaints, and the identity and overlap of the actions alleged, the two cases were consolidated before Judge Figa pursuant to the parties' stipulated motion on August 16, 2005 (Dkt. 11).

By order entered December 14, 2005, Judge Phillip S. Figa appointed the so-called "Wayne County Group," consisting of the Wayne County Employees' Retirement System, the West Palm Beach Firefighters' Pension Fund, Anthony Zigmont and Stuart L. Horn, as the lead plaintiffs in the case. The order also authorized the lead plaintiff to retain the law firms that represented them to act as liaison counsel to represent the purported class (Dkt. 19).

On March 24, 2006 the parties filed an amended consolidated complaint (Dkt. 25). Although the consolidated complaint alleges in greater detail the purported omissions of material facts and alleged false statements, the consolidated complaint contains the same four claims for relief as appeared in the initial complaints. Those claims are: 1) violations of Section 11 of the Securities Act by Defendants Meade, McKenzie, Stephenson and Morgan in connection with the filing of the registration

statement, 2) violations of Section 15 of the Securities Act by all individual defendants as controlling persons, 3) violations of Section 10(b) of the Exchange Act and Rule 10b-5 by all defendants, and 4) violations of Section 20(a) of the Exchange Act by all defendants as controlling persons.

On May 23, 2006, the defendants filed their motion to dismiss the consolidated complaint pursuant to Rule 12(b)(6). The motion argues, essentially, that all four claims for relief are subject to dismissal for failing to state a claim under the respective statutes. This case was transferred to me in January 2008 after the prolonged illness and untimely death of Judge Figa.

## II. THE CONSOLIDATED COMPLAINT

The consolidated complaint, consisting of 102 pages and 190 paragraphs of allegations, essentially alleges a course of conduct by StarTek, a publicly-traded company, over the two-year period described as the class period, to release allegedly false or misleading information into the marketplace for the purpose of propping up the price of StarTek shares. During the class period, four of the individual defendants, or trusts which they allegedly controlled, sold substantial shareholdings in StarTek at the allegedly propped up prices. The vast majority of the shares sold by the insiders were sold in connection with a secondary public offering in June 2004, which was preceded by the filing of the registration statement and amendments referred to above.

### A. Registration statement allegations

Plaintiffs allege that on February 17, 2004, StarTek filed a registration statement for a public stock offering of 3.2 million shares at a proposed maximum price of $39.82

per share and a proposed maximum aggregate value of $146.5 million to be received

by the selling shareholders, and that the market responded favorably to the

representations in the registration statement sending StarTek's stock up 5.3% to over

$42 per share.  They also allege that in the registration statement defendants

represented that "[f]or our capacity deployment strategy, we seek to maintain enough

available capacity to meet our clients' sudden surges in demand while maintaining high

capacity utilization levels throughout our organization."  According to plaintiffs, this

statement was false or misleading because StarTek did not have high utilization rates.

Plaintiffs allege that the company had a tremendous amount of excess capacity due to

the fact that defendants opened four facilities on the mere hope that demand would

materialize (Consolidated Complaint ¶¶ 24, 109).

Plaintiffs further allege that the sale of securities pursuant to the registration

statement was postponed because after StarTek filed its registration statement,

Cingular announced that it was acquiring one of StarTek's major customers, AT&T

Wireless Services ("AWE"), which accounted for approximately 35% of StarTek's

revenues.  Plaintiffs aver that because of the uncertainty of continued business after

the Cingular acquisition, the StarTek stock price declined resulting in the postponement

of the offering (*id.* at ¶ 25).  After the Cingular acquisition announcement, StarTek

renegotiated its contract with AWE.  In an amendment to its registration statement filed

April 13, 2004, StarTek stated:

> AT&T Wireless Services has announced that it has entered an agreement
> to be acquired by Cingular Wireless LLC.  The term of our agreement with
> AT&T Wireless Services was recently extended to December 31, 2006

and is not subject to termination for convenience or without cause.

(*Id.* at ¶ 113).  The same statement was repeated in amendments to the registration

statement filed on May 18, 2004 and May 25, 2004, and in a prospectus issued June

10, 2004 (*id.* at ¶¶ 116, 117, 118).  According to plaintiffs, the amendments to the

registration statement and all of defendants' statements concerning the new contract

with AWE were false or misleading because defendants failed to disclose that StarTek

was forced to drastically reduce its pricing in return for the contract extension (*id.* at ¶¶

26, 141(h)).

The complaint details several other statements contained in the registration

statement, or in amendments thereto, or in press releases issued during the period of

2004 leading up to the secondary offering (*id.* at ¶¶ 109-113, 115-119).  However,

paragraph 141 of the complaint, which purports to set forth the basis of plaintiffs'

allegations that these other statements are misleading, does not expressly or clearly

refer back to these other statements and it is unclear to me how plaintiffs allege these

other statements are purportedly misleading.

Plaintiffs specifically allege that on June 10, 2004, StarTek announced the

pricing of a public offering of 3.8 million shares of common stock at $33.00 per share by

three of its stockholders.  The press release noted that the selling stockholders

increased the offering by 600,000 shares from their 3.2 million share offering

announced February 17, 2004, and that the Company would receive no proceeds from

the sale of the common stock (*id.* at ¶ 29).  Plaintiffs allege the registration statement

and amendments were signed by Defendants Meade, McKenzie, Emmett Stephenson

and Morgan (*id.* at ¶ 109).

Thus, plaintiffs allege these defendants are liable under Section 11 of the Securities Act for the alleged misstatements based on theories of negligence or strict liability (*id.* at ¶ 166). In addition, plaintiffs allege that all the individual defendants are liable for the violations of Section 11 as controlling persons within the meaning of Section 15 of the Securities Act (*id.* at ¶ 173).

### B. Alleged false and misleading statements

Generally, the consolidated complaint sets forth the alleged false and misleading statements by time periods. Thus, paragraphs 99 through 107 allege statements made in 2003, and paragraph 108 alleges why the statements were false or misleading. Similarly, paragraphs 109 through 140 allege statements made in 2004, and paragraph 141 alleges why the statements were false or misleading. Paragraphs 142 through 155 allege statements made in 2005, and paragraph 156 alleges why the statements were false or misleading. The length of the consolidated complaint precludes me from setting forth every alleged false statement or omission asserted by plaintiffs to have been made in violation of Section 10(b) and Rule 10b-5. For purposes of this motion, however, I will generally adopt plaintiffs' categorization of the alleged false and misleading statements, set forth in their opposition brief (Plaintiffs' Response at 49-61), as relating to these six subjects: 1) statements concerning the AWE contract, as discussed above; 2) statements concerning StarTek's SCM business[1]; 3) statements

---

[1] Plaintiffs describe StarTek's SCM business as "supply chain management" engaged in software manufacturing and packaging services for customers such as Microsoft Corporation (Consolidated Complaint ¶ 64). Plaintiffs describe the other aspect of StarTek's

concerning capacity utilization and demand; 4) statements concerning the company's sales pipeline; 5) statements concerning specific customers; and 6) statements concerning management transition.[2]

Among the false or misleading statements alleged with respect to the SCM business is the alleged failure in 2003 to disclose the loss of Microsoft as a customer (*id.* at ¶¶ 68, 108(g)). According to plaintiffs, Microsoft had accounted for 34.4% of the company's total revenues in 2002, or $71.5 million of total revenues of $207.8 million. The revenues attributed to the Microsoft contract amounted to 90% of the entire SCM division's annual revenues (*id.* at ¶ 65). Plaintiffs allege that some of the above information came from a confidential witness ("CW 1"), who is elsewhere described in the complaint as a Vice-president of sales at StarTek from 1993 through 2003 (*id.* at ¶ 56).

Plaintiffs allege that StarTek made false and misleading statements regarding capacity utilization essentially because StarTek did not have high utilization rates (*id.* at ¶¶ 24, 109, 141(a)), because the company had a tremendous amount of excess capacity due to the fact that defendants opened four facilities on the mere hope that

---

business as "business process management" or "BPM," which operates and provides call center services such as customer care, technical support, receivables management and porting services for customers such as T-Mobile and AWE.

[2] Defendants have categorized the alleged statements and omissions as concerning four subjects: 1) the then current demand for StarTek's services, including the opening of new call centers; 2) the strength of StarTek's "sales pipeline"; 3) StarTek's management restructuring; and 4) its contract with AWE as discussed above (*See* Defendants' Motion at 7-8).

demand would materialize (*id*.), and because the company opened new facilities not to service existing demand for current customers, but in the vain hope that demand would materialize in the future (*id*. at ¶11).

Plaintiffs allege that StarTek made false and misleading statements regarding the sales pipeline, a term describing prospective customers, essentially because despite making statements about the health and strength of the pipeline, at the start of the class period there were no contracts on the Pipeline Report with a 90% probability, six contracts with a 50% probability with projected revenues of $8.1 million, 19 contracts with a 30% probability with projected revenues of $7.7 million (*id*. at ¶¶ 58, 108(c)and (f)). Thus plaintiffs allege, contrary to defendants' positive statements, the BPM sales group "had very minimal success" in securing new contracts during 2003 (*id*. at ¶ 75).

Plaintiffs allege that StarTek made false and misleading statements about business arrangements without specifically identifying the customers, referring to them as "two new clients," a "meaningful client in the utility industry" and a "health care company," (*id*. at ¶¶ 115, 122 and 136) when the disclosure of the actual identity of the clients, such as TXU, McKesson, Verizon and Bell Canada would have revealed that the business arrangement with them was not profitable or successful. Plaintiffs allege that the TXU contract was lost in September 2004, only 6 months after it was procured (*id*. at ¶¶ 97, 141(k)), the McKesson proposal did not materialize into a contract (*id*. at ¶¶ 80, 141(n)) and the accounts with Verizon and Bell Canada did not come in to StarTek until sometime in 2005, and these accounts "were no closer in November 2004

than they had been in the prior months of 2004" so that disclosure of these as "two new telecom/utilities clients" in November 2004 was misleading because they were no closer to being finalized at that point than they had been at any earlier time in 2004 (*id.* at ¶ 81).

Plaintiffs allege that StarTek made false and misleading statements about management transition because despite reporting that the management transition, redirection, and refocus is largely complete (*id.* at ¶12) and that new management team has been in place during this period and deserves full credit for these good results (*id.* at ¶ 99), the management transition was not largely complete and in fact, the sales force was in complete disarray and the company was still in the process of hiring key executives (*id.* at ¶¶ 12, 74, 84, 95-97 and 108(b)).

## III. DEFENDANTS' MOTION

Defendants first argue that plaintiffs' lack standing to assert claims under Section 11 because the consolidated complaint does not allege that plaintiffs purchased StarTek shares pursuant to the registration statement (Defendants' Motion at 36-38). They further argue that plaintiffs have not pled that the alleged false statements in the registration statement were material, or were the cause of any losses suffered by plaintiffs (*id.* at 38-39).

Defendants also argue that the claims of false and misleading statements in violation of Section 10(b) and Rule 10b-5 fail because: (1) plaintiffs have not pled that the statements are false by providing particularized facts, (2) the plaintiffs failed to allege particularized facts raising a strong inference of *scienter*, (3) the challenged

statements and omissions are not material, and (4) the statements challenged are "forward looking statements" shielded under the safe harbor provisions of the Private Securities Litigation Reform Act, ("PSLRA."), 15 U.S.C. § 78u-4(b)(1) and (2).

Finally, defendants assert that the control persons claims under Section 20(a) and Section 15 also fail because plaintiffs have pled no primary violations of the law.

## IV. STANDARD OF REVIEW

My function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiffs' consolidated complaint alone is legally sufficient to state a claim for which relief may be granted. *Pirraglia v. Novell*, 339 F.3d 1182, 1197 (10th Cir. 2003). In general, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. *Id.* Here, where defendants' motion also argues that the complaint fails to meet the standards of the PSLRA with respect to the claims asserted under Section 10(b) and Rule 10b-5, I must also consider the strict pleading requirements of that statute and the "inevitable tension" between it and the "customary latitude" granted plaintiffs under Rule 12(b)(6). *Id.*

## V. ANALYSIS

### A. The Section 11 Claims

In order to state a claim under Section 11 plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement, or that they purchased such securities in the aftermarket, but only if they can

demonstrate they bought their securities pursuant to the registration statement, a concept referred to as "tracing." *Joseph v. Wiles*, 223 F.3d 1155,1159 (10th Cir. 2000). Defendants submit that plaintiffs here have not pled they bought their stock pursuant to the 2004 registration statement, and "carefully avoid connecting" their ownership of stock with the securities sold pursuant to the registration statement (Defendants' Motion at 37-38).

Defendants state, and the consolidated complaint itself alleges, that StarTek had at least 3 million shares of stock issued prior to the 2004 secondary offering (Consolidated Complaint ¶ 9). The complaint alleges that on June 10, 2004, StarTek issued a prospectus offering stock at $33.00 per share (*id*. at ¶ 118) and on the same day issued a press release stating that the company announced the pricing of a public offering of 3,800,00 shares at $33.00 per share (*id*. at ¶ 119). Thus, a mere allegation of purchasing StarTek shares during the class period, even after June 10, 2004, does not necessarily mean the stock purchased was issued pursuant to the amended 2004 registration.

Plaintiffs do not disagree with the proposition of law set forth above, but contend that "certain plaintiffs" (unnamed) purchased StarTek stock on the date of the secondary offering, attaching certifications of named plaintiffs as Exhibit B to their response brief (Plaintiffs' Response at 39-40). They further argue that various paragraphs of the complaint supply the specific allegations defendants contend are missing (*id*.). I also note that plaintiffs attached a schedule of stock purchases, sales and losses by the plaintiffs to their motion for appointment of Lead Counsel (Dkt. # 13,

Exhibit A thereto.)

The schedule of stock purchases reflects that plaintiff Horn bought StarTek stock only on May 7, 2004, a date well before the effective date of the June 10, 2004 offering. Plaintiff Zigmont bought stock on June 28, 2004 and July 8, 2004, at prices of $35.13 per share and $34.66 per share, respectively. These dates of purchase were after the effective date of the June 10, 2004 offering and the prices were above the price of the stock on the date of the secondary offering. Thus it appears that these two individual plaintiffs did not buy stock in the secondary offering pursuant to the amended registration statement. Nor have plaintiffs alleged that the shares bought by these two plaintiffs are traceable to the secondary offering.

Exhibit B to Plaintiffs' Response, which was not attached to the consolidated complaint, contains certifications from plaintiff West Palm Beach Firefighters' Pension Fund and plaintiff Wayne County Retirement System, dated in June 2005 and August 2005, respectively, listing stock purchases by date, amount and prices. However, reference to these certifications and their attached exhibits to present evidence of when these plaintiffs acquired stock vis-a-vis the registration statements is outside the complaint. If I were to consider these matters in ruling on this Rule 12(b)(6) motion, then I should treat the motion as one for summary judgment and afford both parties the opportunity to present all pertinent material to rule on a motion for summary judgment. Fed R. Civ.P. 12(c). I decline to do so and will not consider the certifications, which are not part of the consolidated complaint, in determining whether plaintiffs have properly pled standing under Section 11.

As pled, plaintiff never expressly allege their stock was purchased as part of the June 10, 2004 offering pursuant to the amended registration statement or could be traced thereto. I have reviewed each of the complaint allegations which plaintiffs cite in support of their assertion that they have pled that they purchased stock in the secondary offering, or have alleged that the purchased stock is traceable to the secondary offering (Consolidated Complaint, ¶¶ 1, 40, 43, 166). None of the complaint allegations allege in a cognizable manner that the plaintiffs bought stock pursuant to the registration statement, or purchased stock traceable to the registration statement. Although the referenced allegations cite to Section 11, there is no direct allegation that the stock acquired by plaintiffs is traceable to the secondary offering.

Plaintiffs argue that for purposes of a motion to dismiss the court should assume that their shares can be sufficiently traced to the prospectus (Plaintiffs' Response at 40). I do not agree as the law in this circuit is quite clear. As stated in *Joseph v. Wiles*, the burden is on the plaintiff to "prove the securities he bought were those sold in an offering covered by the false registration statement." 223 F.3d at 1159. As further stated in *In re Qwest Communications Intern., Inc.*, 396 F. Supp. 2d 1178, 1202 (D. Colo. 2004), "[a]bsent an allegation that the plaintiffs purchased securities tied to these registration statements, the plaintiffs may not assert a §11 claim based on material misstatements in those registration statements." Here, I have not found such allegations in the consolidated complaint.

Finally, plaintiffs argue that defendants' standing argument is not properly raised at the pleading stage, as it relates to a "contested factual matter." Citing to *Schwartz v.*

*Celestial Seasonings, Inc.,* 178 F.R.D. 545, 557 (D. Colo. 1998), they contend that the issue of tracing is a merits issue. Plaintiffs might have a point if they had alleged their securities purchases could be traced to the stock sold in the secondary offering, and defendants were disputing their tracing theory. But, as noted above, plaintiffs have failed to allege that their stock is traceable to the secondary offering. Moreover, the issue before the court in *Celestial Seasonings* was whether a class could be certified given plaintiffs' prospective tracing difficulties, not whether the complaint contained sufficient allegations to establish standing under Section 11.

As all four of the named plaintiffs have failed to allege that they purchased StarTek stock in the secondary offering, and have failed to allege that stock they purchased after the secondary offering is traceable to the securities offered pursuant to the registration statement or amendments thereto alleged to contain misleading statements, the claims pursuant to Section 11 must be dismissed (First Claim for Relief). I therefore do not reach the other arguments advanced by defendants. As plaintiffs lack standing to assert a claim under Section 11 of the Securities Act, their claim against the defendants as controlling persons under Section 15 must also be dismissed (Second Claim for Relief). These dismissals will be without prejudice to filing an amended complaint to properly plead Sections 11 and 15 violations if plaintiffs are able to do so.

### B. The Section 10(b) and Rule 10b-5 Claims

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiffs' complaint must contain allegations addressing the following five elements: (1)

the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Adams v Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). As further stated by the Tenth Circuit in *Adams,* Section 78u-4(b)(1) of the PSLRA requires plaintiffs to specify the statements by the defendants they allege were misleading, the reasons why the statements were misleading, and, if the allegations in their complaint are made upon information and belief, to state with particularity all facts supporting their belief that the statements were false or misleading. Section 78u-4(b)(2) of the statute requires that plaintiffs' allegations give rise to a strong inference of scienter. *Id.* at 1087.

Citing to both the PSLRA and to Rule 9(b) of the Federal Rules of Civil Procedure, defendants first argue that the consolidated complaint fails to plead particularized facts to show the alleged falsity of the statements made with respect to each of the categories of alleged deceptive statements set forth above (Defendants' Motion at 7-19). Defendants also argue that plaintiffs have failed to allege particularized facts giving rise to a strong inference of scienter (*id.* at 28-31). Defendants further assert that the statements plaintiffs challenge are "forward looking statements" which come within the safe harbor provisions of the PSLRA, or the "bespeaks caution" doctrine, which shield defendants from liability (*id.* at 19-24). Finally, defendants

contend that the alleged false statements regarding the altered pricing of the AWE contract, the sales pipeline and management transition were not material, and thus can not support a Rule 10b-5 violation (*id.* at 24-28).

### 1. The specificity of the alleged false and misleading statements

I first note that the consolidated complaint here, unlike the complaint at issue in the *Adams* case, is not pled on the basis of "information and belief" and so the particularized pleading requirement of Section 78u-4(b)(1) of the PSLRA may not be applicable. Nonetheless, as defendants correctly assert, Rule 9(b) requires pleading of fraud with particularity. Some cases have suggested that in the Tenth Circuit the requirements of the PSLRA did not heighten the pleading requirements. *See e.g. In Re Rhythms Securities Litigation,* 300 F. Supp.2d 1081, 1086 (D. Colo. 2004) ("In my view, the assertion in *Adams* that the PSLRA increased a securities class action plaintiff's burden under Rule 9(b) in pleading the circumstances of fraud is inaccurate and unnecessarily risks invalidating a line of pre-PSLRA decisions that remain accurate and viable interpretations of the standard in the post-PSLRA era. The pre-PSLRA standard for pleading securities fraud in this circuit, consistent with the requirement in Section 78u-4(b)(1), is that a plaintiff must set forth what is false or misleading about a statement and why it is false" citing to *Grossman v. Novell, Inc.* 120 F.3d 1112, 1124 (10th Cir.1997)). Thus, to meet the first element of a securities fraud action, every complaint, whether or not based on information and belief, shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. *Adams, supra*, 340 F.3d at 1096.

Plaintiffs have responded that their consolidated complaint satisfies these pleading requirements under Section 10(b) and the particularized pleading requirements. For the reasons set forth below, I agree.

As noted, after providing the background of the company and the circumstances leading up to the events in the alleged class period, the consolidated complaint separately sets forth the alleged misleading or false statements organized by the year in which they were made (*see* ¶¶ 99-107; 109-140 and 142-155), and separately sets forth a lengthy paragraph detailing why the statements were false or misleading (*see* ¶¶ 108, 141, 156). Defendants may be correct that plaintiffs have not explained how every statement by the company, identified in the complaint as having been made during the years 2003 through 2005, is specifically false or misleading, but there are at least one or more statements with respect to each of the six categories identified above, that are elsewhere in the complaint explained as misleading. As the plaintiffs do not allege their allegations based on information and belief, no more particularity is required under the *Adams* decision.[3]

While defendants argue that some of the statements are not material (Defendants' Motion at 8), or some of them are disputed by other facts (*id.* at 9), such arguments do not justify dismissal of the claims for lack of particularity at this stage of the case. Elsewhere defendants argue that "investors were well aware of the limited

_____

[3] Although, as noted above, not every statement in the registration statement or amendments thereto is expressly referenced in the paragraph explaining the alleged falsity of the statements, there is sufficient detail as to other alleged false statements contained in the complaint.

18

information" being conveyed (*id*. at 15) and that StarTek "had no duty to divulge competitive pricing" in connection with the AWE contract revision (*id*. at 17), but those potential defenses appear to go to the merits of the claims, and not the adequacy of the plaintiffs' pleading. Although stated in the context of evaluating allegations based on information and belief, the following statement in *Adams* provides guidance when evaluating the facts alleged in a securities fraud complaint:

> In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the plaintiff learned of such facts or experts to prove such facts at trial;. . .

340 F.3d at 1102-03. Applying this standard, and evaluating the facts alleged as a whole, I am satisfied that the allegations provide sufficient specificity.

### 2. The allegations of scienter

In a securities fraud case, the requisite level of scienter is "a mental state embracing intent to deceive, manipulate, or defraud," or recklessness. *Adams, supra*, 340 F.3d at 1105. Defendants next argue that plaintiffs' allegations fail to plead with sufficient particularity to satisfy Section 78u-4(b)(2) of the PLSRA, requiring facts that give rise to a strong inference of scienter. In *Adams*, the Tenth Circuit stated that it interpreted this provision to mean that "when reviewing a plaintiff's allegations of scienter under the PSLRA, a court should examine the plaintiff's allegations in their entirety and determine whether the plaintiff's allegations, taken as a whole, give rise to

a strong inference of scienter." *Id.* (Internal quotations and ellipsis omitted). A strong inference of scienter is a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading. *Id.* Following the model of the Tenth Circuit in *Adams*, I consider the allegations of scienter as to each defendant.

The consolidated complaint alleges that all the individual defendants, because of their positions and access to material non-public information available to them but not to the public, knew that the adverse facts specified in the complaint had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading (Consolidated Complaint ¶ 52).

The complaint further alleges that Defendants Stephenson, Meade, Morgan and McKenzie, because of their positions with the Company, possessed the power and authority to control the contents of StarTek's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, and that Defendants Stephenson, Meade, Morgan and McKenzie were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected (*id.* ¶ 53). The complaint further alleges that during the Class Period, defendants Stephenson, Meade, Morgan and McKenzie knew the adverse material facts specified in the complaint because they reviewed daily, weekly and monthly operating and sales

reports and attended periodic meetings with the executive officers and their direct reports (*id.* ¶ 54). According to the complaint, Stephenson conveyed the adverse material information to defendants Toni Stephenson and Pam Oliver (*id.*).

I also note that the consolidated complaint contains a section subtitled "FACTS RAISING A STRONG INFERENCE OF SCIENTER," (*id.* at ¶¶ 56-97), apparently included specifically to meet the pleading requirements of Section 78u-4(b)(2). Most of the paragraphs in that section reference information provided by one of seven confidential witnesses, identified by the notation "CW." While the information in the paragraphs is grouped by the alleged source, the information is not always clearly connected to the particular alleged categories of misleading statements discussed above, making it difficult in some cases to ascertain the relevance of the information provided by the alleged confidential witness.

### A. Defendants Toni Stephenson, Pam Oliver and Michael Morgan

Nonetheless, I initially note that none of the paragraphs alleging "facts" specifically regarding scienter relate to Defendants Toni Stephenson or Pam Oliver, who were not officers or directors of StarTek during the class period, but rather were the owners of, or the person controlling, large percentages of StarTek stock (Consolidated Complaint ¶¶ 50, 51). Plaintiffs' basis for alleging scienter on the part of these two defendants appears to rest on allegations that they were provided with material non-public information by Emmett Stephenson, the husband of Toni Stepehnson and brother of Pam Oliver, leading them to sell what plaintiffs describe as substantial amounts of StarTek shares under circumstances described as "suspicious

insider trading." (Plaintiffs' Response at 82-83).

Nor do any of the allegations purporting to set forth facts showing scienter mention Defendant Morgan, who elsewhere is alleged to be the Vice Chairman of StarTek since June 2001 and a director since January 1997 (*id.* at ¶ 48). However, he is alleged to have had knowledge of material undisclosed facts because of his position with the company (*id.* at ¶ 53) and evidence of his scienter is also based on his sale of substantial shares of StarTek stock (Plaintiffs' Response at 82-83).

Plaintiffs rely on *In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) *cert. denied* 546 U.S. 1172 (2006), for the proposition that "unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." I note that the *Daou* decision goes on to say that "the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants." *Id.* at 1022-23.

Similar law is found in the Tenth Circuit, albeit in unreported decisions. In *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735 *11 (D. Colo., June 21, 2005), Judge Richard Matsch held that sales of stock personally held by a defendant are relevant to whether the allegations, taken as a whole, give rise to a strong inference of scienter. To create a strong inference of scienter, the plaintiff must allege facts showing that the trades were made at times and in quantities that were suspicious. The case further holds that factors relevant to determining whether the trades were suspicious include: (i) whether the alleged trades were "normal and

22

routine" for the insider, (ii) whether the profits reaped were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud; and, (iii) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious. *Id. See also McNamara v. Pre-Paid Legal Services, Inc.*, 189 Fed. Appx. 702, 715 (10th Cir., July 14, 2006) (in context of determining presence of scienter, citing to Ninth Circuit case holding that insider trading may support a finding of bad faith "if such trading is conducted in amounts dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information.").

Plaintiffs here argue that the stock sales by Defendants Toni Stephenson, Pamela Oliver and Michael Morgan meet these standards because the amount and percentage of shares sold was suspicious, the timing of the sales was suspicious, and the sales were not consistent with prior trading history (Plaintiffs' Response at 83-91).

Plaintiffs allege that in the two year period prior to the class period, Defendant Stephenson sold no shares of StarTek stock, whereas during the class period she sold 3,158,551 shares of StarTek stock, 83.29% of her holdings, for proceeds of approximately $100 million (Consolidated Complaint ¶ 50). They allege that Pamela Oliver, as the sole trustee of the FASSET and MASSET trusts, sold no shares of StarTek stock during the two year period preceding the class period, but during the class period each trust sold approximately one million shares of StarTek stock, 100% of their holdings, for proceeds of approximately $34 million each (*id.* at ¶ 51). Plaintiffs

allege that Defendant Morgan, during the two year period preceding the class period, sold 397,800 shares of StarTek stock, or 68.64% of his holdings at the time, for proceeds of approximately $7.8 million, and that during the class period he sold an additional 142,600 shares of StarTek stock, or 71.53% of his remaining holdings, for proceeds of approximately $5 million, and further allege that although Morgan sold more shares during the two years before the class period, he received an average weighted price per share of only $19.84 compared to $35.73 per share during the class period (*id*. at ¶ 48).

Defendants counter that the sales of stock by Defendants Toni Stephenson and Pam Oliver are not suspicious or unusual because prior to the time of the sales both were restricted from selling stock by the provisions of SEC Rule 144, restricting the stock of unregistered shares. They further argue that since Oliver was not alleged to have made any of the misleading statements, or to have knowledge of their alleged falsity, any finding of scienter is unsupported. Defendants also submit that despite the sales by Defendant Toni Stephenson, the complaint fails to mention that a substantial portion of her sales were made in late November 2004, after the stock price began to slide, and that since her husband, Defendant Emmett Stephenson, did not sell any of his stock, they collectively retained 53% of their combined holdings to the end of the class period, theoretically costing them tens of millions of share value as the stock price dropped (Defendants' Motion at 34-35). Thus, they contend all these factors taken together negate an inference of scienter on the part of Defendants Toni Stephenson and Pam Oliver.

Defendants also counter that Defendant Morgan, having sold four times as many shares in the two years preceding the class period, having netted $3 million more than his sales during the class period, and having made his last sale in March 2004, before the secondary offering, cannot be found to have engaged in suspicious trading during the class period (Defendants' Motion at 33). Plaintiffs respond that Defendant Morgan sold 82,600 shares of StarTek stock between August 19, 2003 and September 17, 2003, for approximately $3 million, at a time when he knew the company had lost the Microsoft contract but it had not yet been disclosed to the public, and at a time when the pipeline report contained few contracts with a high probability (Plaintiffs' Response at 87; Consolidated Complaint ¶¶ 17, 51, 98). Plaintiffs further respond that when Morgan sold his last shares in March 2004[4], the company had failed to achieve the McKesson contract, had lost the Verizon contract, and knew that the Cingular acquisition of AWE jeopardized 35% of the company's revenues (*id.* at ¶ 87).

As this case is before me on a motion to dismiss pursuant to Rule 12(b)(6), I am bound to accept as true all well-pleaded allegations and consider them in a light most favorable to the plaintiff. However in *Pirraglia v. Novell, Inc.*, *supra*, the Tenth Circuit considered the relationship between the PSLRA and this standard. *Pirraglia* instructs that in evaluating allegations of scienter in a securities fraud complaint, the court may consider negative inferences that may be drawn against the plaintiff, such as the

---

[4] The Plaintiffs' Response does not detail the number of shares sold by Morgan in March 2004, but based on my review of paragraph 98 of the Consolidated Complaint, it appears to allege that he sold at least 60,000 shares for at least $2,000,000.

counter arguments regarding the alleged suspicious trading offered by the defendants in this case. 339 F.3d at 1187. Nevertheless, when faced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate for me to make a determination on a motion to dismiss as to which inference will ultimately prevail, for doing so would invade the traditional role of the factfinder. *Id.* at 1188.

Here, I find that the respective counter arguments regarding the trading by Defendants Toni Stephenson, Pamela Oliver and Michael Morgan present equally strong inferences as to the trading activity. The extent and timing of their securities trades, coupled with the allegations that they were supplied with material, non-public information, supports a strong inference that these defendants knew something was amiss when they made these trades. As noted above, scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Yet, as stated in *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001), "to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors."

It may well be that the trading by Defendants Toni Stephenson, Pamela Oliver and Michael Morgan will be found by a jury to be innocent of deception. But at this stage of the case I will not remove the resolution of the conflicting inferences from the province of the jury. Accordingly, I find that the alleged suspicious trading activity,

26

coupled with allegations of knowledge of the non-disclosed information, supplies the strong inference of scienter required under Section 78u-4(b)(2).  Accordingly, I cannot dismiss the claims alleged against these Defendants on the ground that plaintiffs have failed to satisfy the scienter pleading requirements of Section 78u-4(b)(2).

B. Defendants Emmett Stephenson, Eugene McKenzie and William Meade

The allegations of scienter on the part of Defendants Emmett Stephenson and Eugene McKenzie are not based on alleged suspicious insider trading as neither defendant is alleged to have engaged in trades during the class period.  However, as plaintiffs correctly argue, the lack of stocks sales by these two defendants does not alone negate the inference of scienter.  *See Pirraglia, supra,* 339 F.3d at 1191, n. 12 ("We will not, as defendants request, infer from the fact that they did not sell [stock] that they lacked motive to defraud investors.").

Defendant William Meade, who served as President of StarTek throughout the class period, is alleged to have sold 15,000 shares of StarTek stock, or 100% of his holdings, during the class period for proceeds of $570,677.  He had sold no shares in preceding two year period (Consolidated Complaint ¶ 47).  The complaint alleges that all of these sales were made between September 15, 2003 and December 8, 2003 (*id.* at ¶ 98).

Defendants' motion acknowledges the sales of 15,000 shares by Meade, but asserts that they only represent 12% of his StarTek holdings as he had vested options for 80,000 shares of stock, and thus retained 88% of his holdings (Defendants' Motion at 32).  They further point out that all of his sales, having been completed by late

2003, were made at a time before the possible loss of the AWE contract was at issue, and before he made his allegedly false statements about the company pipeline (*id.).* Moreover, defendants assert, Meade's stock sales were made pursuant to a written Rule 10b5-1 trading plan that removed from him all discretion as to the timing of his trades (*id*.).

Plaintiffs' response makes no counter argument to the assertion that Defendant Meade had no discretion over the timing as to when his shares were sold. Thus, unlike the situations discussed above, I find that a strong inference of scienter on the part of Defendant Meade cannot be made from his stock trading, alone.

Indeed, plaintiffs argument with respect to these three defendants appears to be based on the assertion that the complaint avers sufficient direct evidence of scienter on the part of each of these three defendants to satisfy the pleading requirement of Section 78u-4(b)(2) (Plaintiffs' Response at 78-82). The complaint alleges generally, as noted above, that each of these defendants possessed material non-public information regarding the company, knew of adverse material facts regarding the company, and pursued a common goal of inflating StarTek stock by making false and misleading statements and concealing adverse information designed to deceive the investing public and cause plaintiffs and other to purchase the stock at inflated prices (Consolidated Complaint ¶¶ 52-55). But this type of common pleading does not satisfy the particularity requirements of the statute, and the alleged scienter of each defendant must be separately considered.

*Defendant McKenzie*

28

The plaintiffs allege that Defendant McKenzie became Chief Financial Officer of StarTek in early November 2003 and remained in that position until October 1, 2004 (Consolidated Complaint ¶ 14). The complaint alleges that in this position he reviewed daily, weekly and monthly operating statements and sales reports, and attended periodic meetings with the other executive officers (*id.* at ¶ 54). While the complaint alleges that StarTek's "executive management" absolutely knew by early 2003 that the Microsoft contract had been lost (*id.* at ¶ 68), there is no indication that Defendant McKenzie was part of the "executive management" at that time.

The complaint alleges that Defendant McKenzie signed the February 2004 registration statement, which allegedly contained deceptive statements, including at least regarding the status of the AWE contract. Although I have already held that plaintiffs lack standing to claim these defendants are strictly liable under Section 11 for signing the registration statement, the corporate official who acting with scienter signs an SEC filing containing misrepresentations may be liable as a primary violator under Section 10(b). *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000). Thus, if the complaint alleged with specificity that Defendant McKenzie knew, when he signed the February 2004 registration statement, or the amendments thereto, that the pricing of the AWE contract had been reduced, and he failed to disclose that fact at the time he signed the SEC filing, such allegation would create a strong inference of scienter. However, I am unable to find a clear allegation in the consolidated complaint to support such knowledge on the part of McKenzie.

The complaint alleges that Defendant McKenzie during his first six months as

CFO traveled with the company chairman, Defendant Emmett Stephenson, for the purpose of presenting the "investor road shows" in connection with the secondary offering (*id.* at ¶ 86). During these road shows, the defendants may have made statements generally regarding the company or confirming information in the registration statements, yet there are no specific allegations in the complaint that McKenzie made any such statements.

The complaint does allege specific statements made by Defendant McKenzie in a conference call with analysts held on July 29, 2004 (*id.* at ¶¶ 124-125). He allegedly responded to a question about the company's "two new clients" by stating that "both those clients are coming online" and a question about existing clients by stating "it's going very well." *Id.* Such response may have been a misleading statement if it was referring to one of the customers discussed above, such as McKesson, Verizon or Bell Canada, or if it referred to Microsoft at a time when the company knew the contract would be expiring. But, I cannot determine such a connection from the way the allegations are set forth in the complaint. There does not appear to be any explanation in the complaint as to what facts would make these specific statements by McKenzie misleading or indicative of fraudulent intent.

On the other hand, the complaint alleges that in early July 2004, Confidential Witness 5 presented quarterly sales results for the second quarter of 2004 that "didn't line up with forecasts" for that quarter (*id.* at ¶ 86). According to the confidential witness, when McKenzie saw the results he stated "We can't have that" and he directed accounting manager Kevin Comstock to "change the numbers" by "pulling funds out" of

a particular account. By doing so, StarTek was able to report that it met revenue and earnings projections for the second quarter of 2004. The complaint alleges that the confidential witness also advised McKenzie at the time that StarTek would not meet its projections for the third and fourth quarters of 2004 (*id.*).

Defendants argue that such allegations are too vague to raise an inference that McKenzie did anything improper (Defendants' Motion at 30), but I cannot agree. While it is true there is no allegation that McKenzie acted with respect to the information about the third and fourth quarters, there is an allegation, whether true or not, that he apparently sought to change the accounting numbers to conceal a shortfall in company projections for the second quarter. Such action can be indicative of an intent to deceive readers of the financial information. CW 5 is described in the complaint as holding a position in the company's finance department, and at a vice-president level during the last year of his employment up to mid-2005 (*id.* at ¶ 85), thus there is a basis for crediting his assertions. At least as to the conduct of McKenzie alleged to have occurred in July 2004, there is a strong inference that he acted with scienter.

### Defendant Meade

Defendant Meade is alleged to have been the president and Chief Executive Officer of StarTek from June 2001 through February 16, 2005 (Consolidated Complaint ¶ 47). Like McKenzie, he signed the registration statement and amendments, and is liable for any misstatements contained therein. As noted, the registration statement contains a claim that StarTek had "high capacity utilization levels" (*id.* at ¶ 109), which plaintiff claims was a false and misleading statement. The registration statement also

is alleged to contain misleading information about the AWE contract. The complaint relies, in part, on Confidential Witness 1, who allegedly reported to Meade from September/October 2002 through June 2003, to provide the allegations of scienter (*see id.* at ¶ 56). However, as with Defendant McKenzie, I find no allegation in the complaint that specifically alleges that Defendant Meade knew of the re-pricing of the AWE contract, or was involved in the non-disclosure of this information (*cf. id.* at ¶ 69). Nor does this confidential witness expressly address the actions on the part of Meade regarding the claims of high capacity utilization levels.

On the other hand, Confidential Witness 1 does expressly relate that the loss of the Microsoft contract, a material fact alleged by plaintiffs to have been concealed, was known to Meade and he participated in discussions as to how those revenues were to be replaced (*id.* at ¶ 68). Confidential Witness 1 also provides specific information indicating that Meade was aware of the alleged lack of firm contracts in the StarTek pipeline, (*id.* at ¶ 57-58), a problem which plaintiffs allege was concealed or misrepresented in the marketplace (*id.* at ¶ 108(c)). In addition, Confidential Witness 2 provides information that although StarTek announced in November 2003 that it would be opening a 400-seat call center in Alexandria, Virginia to service a Verizon contract, it knew at the time that the contract had been cancelled or the opening would be delayed (*id.* at ¶ 71). This latter fact was not disclosed. Confidential Witness 2 states that Meade was in charge of meetings regarding how to replace the cancelled or delayed Verizon order (*id.* at ¶ 72), and thus he was aware of the issue regarding this lost revenue and yet no disclosure was made. I find that this information raises a

strong inference of scienter on the part of Meade so as to satisfy the requirements of Section 78u-4(b)(2).

*Defendant Emmett Stephenson*

Defendant Emmett Stephenson is alleged to be the co-founder of StarTek and the Chairman of the Board from its formation (*id*. at ¶ 46). As with the other defendants, he is alleged to have possessed material non-public information regarding the company, to have known of adverse material facts regarding the company, and to have pursued a common goal of inflating StarTek stock by making false and misleading statements and concealing adverse information designed to deceive the investing public and cause plaintiffs and other to purchase the stock at inflated prices (Consolidated Complaint ¶¶ 52-55). As a member of executive management in early 2003, he is alleged to have known about the loss of the Microsoft contract (*id*. at ¶ 68), a material fact plaintiffs allege was not disclosed. He also signed the registration statement and the amendments thereto, particularly one referring to the AWE contract extension, without disclosing the reduced pricing (*id*. at ¶ 114). In addition, some of the company's statements to the public and the investment community are attributed to him. For example, he is quoted in a press release dated February 27, 2004, as stating "we successfully opened four new facilities last year, which increased capacity significantly, to meet growing demand for our outsourced services." (*Id*. at ¶ 110). Such statement is alleged to be misleading because there was insufficient existing and forecasted demand to utilize such new facilities (*id*. at ¶ 121(a)). The fact that he was the most senior executive of the company is also a factor weighing on the totality of the

allegations regarding the scienter of Defendant Stephenson.  *See Adams, supra*, 340 F.3d at 1106.

For the reasons set forth above, I find that the consolidated complaint provides sufficient allegations of scienter on the part of all six individual defendants to satisfy the pleading requirements of  Section 78u-4(b)(2).  As the complaint adequately alleges scienter on the part of the four executive officers, those allegations are also sufficient to allege scienter to defraud on the part of StarTek itself.  The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of Section 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.  *Adams, supra*, 340 F.3d at 1106.

**3.** *"Forward looking statements" and the safe harbor provisions of the PSLRA*

The safe harbor provision of the PSLRA shields from liability forward-looking statements if they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, or if the forward looking statement is immaterial. 15 U.S.C. §§ 78u-5(c)(1)(A) and 77z-2(c)(1)(A). Defendants contend that because the alleged false and misleading statements identified by plaintiffs are "forward looking statements" with respect to which the defendants also provided the requisite cautionary statements, or because the statements were not material, they are not liable under the safe harbor provisions of the PSLRA (Defendants' Motion at 19-23).[5]

The particular statements defendants claim are shielded are statements about future demand and future business from customers in the sales pipeline (*id.* at 20-22). Plaintiffs respond that defendants' argument is a misreading of their complaint and ignores other factual allegations (Plaintiffs' Response at 71-77). Primarily , plaintiffs argue that the safe harbor provisions of the PSLRA do not insulate the false or misleading disclosure or non-disclosure of "known facts." (*id.* at 74).

To the extent I have determined above the alleged misleading statements on which plaintiffs' complaint relies, I find several alleged misleading statements which cannot fairly be described as forward looking and which may be material, if true. The

---

[5] Although they refer to the related "bespeaks caution" doctrine, essentially a pre-PSLRA judicially created doctrine, *see Grossman v. Novell*, Inc., 120 F.3d 1112, 1120-22 (10th Cir. 1997), the defendants do not separately argue its application.

alleged non-disclosure of the loss of the Microsoft contract, which allegedly represented 34.4% of the company's revenues, is not a forward looking event nor is it plainly immaterial (*see* Consolidated Complaint ¶¶ 63-65). The non-disclosure of the renegotiation of the AWE contract to the extent it resulted in reduced contract rates, and required a front payment of $1 million (*see id*. at ¶ 69) was not a forward looking statement, and such facts may well become material when the company is otherwise telling the market that the term of the agreement was extended and is not subject to termination for convenience or without cause (*id*. at ¶ 113). Failing to disclose the cancellation or delay of the operations of the Verizon call center in November 2003 is hardly a forward looking statement, nor is it obviously immaterial (*id*. at ¶¶ 71-72, 79). Leading investors to believe that a contract with a health care company is in the works, and not disclosing that the contract has not been received is not a forward looking event (*id*. at ¶ 80). Certainly, shifting revenues from one account to another to cover a shortfall, if that occurred, is not a forward looking event (*id*. at ¶ 86).

It may well be, as defendants argue, that some of the many statements alleged in the consolidated complaint will turn out to be forward looking statements, or as this case progresses those statements may be deemed immaterial. The statements may be subject to further motion practice. But at this stage of the case dismissal of the complaint on the basis of the safe harbor provisions of the PSLRA is not justified.

### 4. *Materiality*

Defendants contend that some of the alleged misleading statements are not material and therefore cannot be the basis for a claim under Section 10(b) or Rule 10b-

5.  As I have already noted above, I find the above-referenced non-disclosures or misleading statements may well be found to be material in the context in which they were made, and I cannot find as a matter of law that they were not material. In fact, perhaps the best evidence that these statements are arguably material, if in fact they were made as alleged by plaintiffs, is to simply quote from defendants' own cautionary statement to its investors: "a material reduction in the amount of business we receive from a principal client, or the loss, delay or termination of a principal client's product launch or service offering would harm our business, revenue and operating results." *See* Defendants' Motion at 21 quoting from StarTek's Form 10-k for 2003, Exhibit B thereto at 21.

Many of the alleged misleading statements relate to these very subjects.  Thus, by defendants' own words, such non-disclosures or misstatements may well be found to be material.

For the reasons set forth above, plaintiffs' claims under Section 10(b) and Rule 10b-5 are not subject to being dismissed.

### C. Control Person Liability Under Section 20(a)

Although I have found that all six of the named individual defendants may be liable as primary violators of Section 10(b) and Rule 10b-5, I find insufficient probative allegations that Defendants Toni Stephenson and Pamela Oliver exercised power or authority to cause StarTek to engage in the alleged unlawful conduct.  Accordingly, the claims against them as control persons under Section 20(a) of the Exchange Act are subject to being dismissed.

## VI.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (Dkt. # 29) is GRANTED in part and DENIED in part.

It is granted as to the First and Second Claims for Relief in the consolidated complaint as all plaintiffs lack standing to assert claims under Section 11 of the Securities Act, and therefore those claims are dismissed without prejudice to plaintiffs filing an amended consolidated complaint by April 21, 2008.

It is denied as to the Third and Fourth Claims for Relief, except that the Fourth Claim, alleging control person liability under Section 20(a) of the Exchange Act is dismissed against Defendants Toni Stephenson and Pamela Oliver.

Defendants are directed to file an answer within 20 days of plaintiffs filing an amended consolidated complaint, but no later than May 12, 2008.

DATED: March 28, 2008

BY THE COURT:

s/ Walker D. Miller

_____

Walker D. Miller
United States District Judge