**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-01265-WDM-MEH
(Consolidated with 05-cv-01344-WDM-MEH)

WEST PALM BEACH FIREFIGHTERS' PENSION FUND,
On Behalf of Itself, and All Others Similarly Situated,

      Plaintiffs,

v.

STARTEK, INC., et al.,

      Defendants.

---

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(6) AND THE PRIVATE SECURITIES LITIGATION
REFORM ACT**

---

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ..................................................................................................1

II.  ARGUMENT........................................................................................................2

    A.   The Amended AWE Contract and Microsoft SCM Business Form the
        Gravamen of the ACC and of This Court's March 28, 2008 Order ......................2

    B.   The Opposition Confirms That the ACC Fails to Plead "Loss Causation"
        as to the Amended AWE Contract and the Microsoft SCM Business ..................3

        (1)   Despite Plaintiffs' "Bait and Switch" on the Amended AWE
                Contract, the ACC Shows that the Price Reduction Was Fully
                Disclosed and Did Not Cause Any Loss ......................................................3

        (2)   The Loss of the Microsoft SCM Business Was Disclosed and Did
                Not Cause a Stock Drop .............................................................................5

    C.   The Section 10(b) Claim Against Toni Stephenson and Pam Oliver Should
        be Dismissed Because the Market Did Not Rely on Any Statement or
        Conduct by These Defendants..............................................................................7

    D.   The Section 11 Claim Should Be Dismissed Because the ACC Fails To
        Comply With This Court's Order On "Tracing." ................................................9

III. CONCLUSION ..................................................................................................11

## TABLE OF AUTHORITIES

PAGE

### CASES

*Adams v. Kinder-Morgan, Inc.,*
340 F.3d 1083 (10th Cir. 2003) ................................................................8

*Bell Atlantic Corp. v. Twombly,*
127 S. Ct. 1955 (2007) .........................................................................6

*Brody v. Transitional Hosps. Corp.,*
280 F.3d 997 (9th Cir. 2002) ................................................................8

*Caiafa v. Sea Containers Ltd.,*
525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...................................................10

*Copland v. Grumet,*
88 F. Supp. 2d 326 (D.N.J. 1999) ..........................................................9

*Demaria v. Andersen,*
318 F.3d 170 (2d Cir. 2003) ...............................................................11

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005) ............................................................5, 7, 8, *passim*

*Evergreen Equity Trust v. Fannie Mae,*
503 F. Supp. 2d 25 (D.D.C. 2007).........................................................8

*In re Friedman's, Inc. Sec. Litig.,*
385 F. Supp. 2d 1345 (N.D. Ga. 2005)..................................................10

*Higginbotham v. Baxter Int'l, Inc.,*
495 F.3d 753 (7th Cir. 2007).................................................................6

*In re Initial Pub. Offering Sec. Litig.,*
227 F.R.D. 65 (S.D.N.Y. 2004)............................................................11

*Joseph v. Wiles,*
223 F.3d 1155 (10th Cir. 2000) ...........................................................10

*Klein v. Computer Devices, Inc.,*
591 F. Supp. 270 (S.D.N.Y. 1984).......................................................11

*Lee v. Ernst & Young,*
294 F.3d 969 (8th Cir. 2002) ...............................................................11

*In re Marsh & McLennan Cos. Sec. Litig.,*
501 F. Supp. 2d 452 (S.D.N.Y. 2006)...................................................10

*In re Metro. Secs. Litig.,*
532 F. Supp. 2d 1260 (E.D. Wash. 2007)..............................................10

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*In re Nat'l Century Fin. Enter. Inc. Inv. Litig.*,
  --- F. Supp. 2d ---, 2008 WL 918708 (S.D. Ohio April 2, 2008) ...............................................7

*Sidebotham v. Robison*,
  216 F.2d 816 (9th Cir. 1955)...............................................................................................2

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  128 S. Ct. 761 (2008) ...............................................................................................1, 7, 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007) ......................................................................................................6

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) ................................................................................7

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007) .........................................................................7

**STATUTES**

15 U.S.C.
  § 78u-4(b)(1) ......................................................................................................................4

15 U.S.C.
  § 78t-1.................................................................................................................................8

**OTHER AUTHORITIES**

17 C.F.R
  § 240.10b-5........................................................................................1, 7, 8, 9, 11, *passim*

FEDERAL PRACTICE & PROCEDURE
  § 1361 ................................................................................................................................2

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 12(b)(6) .............................................................................................................................2
Rule 8(a) ...................................................................................................................................6

Defendants respectfully submit this Reply in Support of their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") filed on June 5, 2008 ("Opening Brief" or "Op. Br.") (Dkt. 61).

## I. INTRODUCTION

This motion to dismiss challenges three legal deficiencies in the Amended Consolidated Complaint ("ACC") (Dkt. 60).

*First*, as shown in detail below, the Opposition does not dispute that the core of this case relates to two issues: (1) whether StarTek failed to disclose the price reduction in the Amended AWE Contract, and (2) whether StarTek failed to disclose the loss of the Microsoft Supply Chain Management ("SCM") business. The ACC, this Court's March 28, 2008 Order ("Order") (Dkt. 52), and Plaintiffs' Opposition to the Motion to Dismiss ("Opposition" or "Opp.") (Dkt. 66) repeatedly emphasize these two issues, which comprised over 90% of StarTek's SCM business and 70% of its total revenue. There is certainly no suggestion that the other far more generic issues would satisfy the PSLRA in the absence of the AWE and SCM allegations. However, the ACC and judicially noticeable documents unambiguously show that StarTek fully disclosed and quantified the price reduction in the Amended AWE Contract and the loss of Microsoft SCM business. More importantly, the allegedly false statements about these two central issues are not alleged to have caused any loss, and the Company's stock did not drop when either was disclosed.

*Second*, the Section 10(b) claim against Toni Stephenson and Pam Oliver should be dismissed in light of the recent Supreme Court decision in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008). The ACC does not allege market reliance on any statements or conduct by Toni Stephenson and Pam Oliver. Plaintiffs conflate the concept of market reliance (central to this case) with the unrelated issue raised in pure insider trading actions by the government or by contemporaneous traders. This is a market case seeking damages for a purported class resulting from a stock drop. Demonstrating reliance by the market

1.

on the statements or conduct of each defendant is an absolute requirement, and plaintiffs have not met this requirement.

*Finally,* the Section 11 claim should be dismissed because plaintiffs have failed to comply with this Court's Order, which instructed them to allege "tracing." Because this case involves fungible shares of a stock that was already in the market (and not a new or different class or type of shares), plaintiffs will never be able to comply with this Court's Order. Plaintiffs are pursuing a Section 11 claim on behalf of all market purchasers of StarTek's stock for a 26-month period straddling the secondary offering, and as shown below, there is no conceivable way to "trace" any of these stock purchases to the registration statement.

The Opposition fails to resolve these narrow but fundamental legal deficiencies in the ACC. Contrary to plaintiffs' contentions, this motion does not seek reconsideration of the Order but rather, is an effort to follow-up on issues that were clarified and elucidated by that Order.[1]

II.   **ARGUMENT**

   A.   **The Amended AWE Contract and Microsoft SCM Business Form the Gravamen of the ACC and of This Court's March 28, 2008 Order.**

The Opposition does not dispute that the Amended AWE Contract and the Microsoft SCM business form the centerpiece of the ACC and of this Court's March 28, 2008 Order. The Opposition and the Order both repeatedly cite and rely on these two issues, far more than any others. (*See* Opp. at 2, 4, 5, 6, 7, 8, 19, 20, 21, 26; Order at 5, 6, 7, 17, 19, 28, 29, 32, 33, 36 (Amended AWE Contract); Opp. at 2, 4, 5, 6, 8, 9, 26; Order at 7, 8, 25, 29, 30, 32, 33, 36 (loss of Microsoft SCM business).) These two issues together accounted for over 90% of all SCM business and 70% of total Company revenues. (*See id.* at 6-9; Order at 5, 7-8.) Accordingly,

---

[1] As a matter of law, when a plaintiff files an amended complaint, defendants may challenge the legal sufficiency of that complaint in its entirety. *See, e.g., Sidebotham v. Robison,* 216 F.2d 816, 823 (9th Cir. 1955) ("[O]n the filing of [an] amended complaint which carried over the causes of action of the [prior] complaint, the [defendants] were free to challenge the entire new complaint."); *see also* 5C Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1361 ("[W]henever the court allows a party to amend its pleading, the opposing party's right to interpose a Rule 12(b) motion is extended or revived accordingly.")

while the Court also briefly addressed four other much more generalized allegations, the SCM

and AWE issues indisputably form the basis of the ACC.[2]

**B.      The Opposition Confirms That the ACC Fails to Plead "Loss Causation" as to the Amended AWE Contract and the Microsoft SCM Business.**

**(1)      Despite Plaintiffs' "Bait and Switch" on the Amended AWE Contract, the ACC Shows that the Price Reduction Was Fully Disclosed and Did Not Cause Any Loss.**

As shown in the Opening Brief at 3, the original Consolidated Complaint ("CC")

selectively quoted from StarTek's August 9, 2004 10-Q and asserted that the Company had

failed to disclose the price reduction in the Amended AWE Contract. In reality, plaintiffs simply

deleted from the description of the 10-Q the specific disclosure by StarTek that the prices in the

Amended AWE Contract had been reduced. In filing the ACC, plaintiffs added this disclosure,

claiming it was a "clarif[ication]." (Opp. at 6.) In any event, as a result of the ACC, it is no

longer disputed that the price reduction in the Amended AWE Contract was disclosed.

But now, plaintiffs are engaged in conduct that is even more misleading.

Having now admitted that StarTek disclosed the price reduction in the Amended AWE

Contract, in the Opposition, plaintiffs contend that StarTek "never revealed the extent of the

pricing reduction in any disclosure." (Opp. at 6-7.) This is flat wrong. StarTek disclosed and

quantified the price reduction in the same August 9, 2004 10-Q. That disclosure stated:

> **[Our] contract extension with [AWE], which became effective April 1, 2004, includes a tiered pricing structure that provides for _lower pricing at higher volumes. As a result, second quarter of 2004 revenue was $1.0 million lower than it would have been under the prior contract._**

(Supplemental Request for Judicial Notice, Ex. NN (Dkt. 61-4) (emphasis added); _see_ ACC ¶ 27

---

[2] In addition to the AWE and SCM issues, the ACC has identified four other, more generalized issues: (1) a generalized decrease in capacity utilization and demand (which plaintiffs do not dispute relates mostly to the AWE Contract); (2) the projected future sales pipeline (a speculative issue that was unquestionably "forward looking"); (3) miscellaneous statements about smaller customers, and (4) the announcement that the CEO was leaving the Company (which was not even arguably a "false" or "misleading" statement). (Order at 7-8.) The AWE and SCM issues dwarf these four items, both economically and substantively.

(citing StarTek's 2004 10-Q dated August 9, 2004 at 13).) Incredibly, when filing the ACC, plaintiffs added only the first part of the above quote – i.e. that the Amended AWE Contract had lower prices. However, plaintiffs left out the very next sentence. The sentence that plaintiffs omitted from the ACC quantified the actual quarterly impact of that price reduction (i.e. $1 million for the quarter). Apparently assuming that the Court and the defendants would not notice, plaintiffs then falsely asserted that the "extent" of the AWE price reduction was not disclosed. But now, the truth is before the Court, and the Court can see that StarTek categorically disclosed the price reduction and the financial impact of that reduction.

Plaintiffs attempt to escape this dilemma by suggesting (without the slightest authority) that the Company's disclosure of the price reduction was insufficient because it did not use the adjective that plaintiffs selected for the ACC – i.e. that the price reduction was "drastic." (Opp. at 7.) However, plaintiffs have not pled any facts about the scope or amount of this price reduction, nor have plaintiffs asserted that the $1 million reduction disclosed by the Company was inaccurate. (*See id.*) Thus, plaintiffs have not complied with the PSLRA's particularity requirements. *See* 15 U.S.C. § 78u-4(b)(1). Further, the securities laws do not invite or permit this kind of a word-game over a disclosure issue. The price reduction in the Amended AWE Contract and the economic impact of that price reduction was fully disclosed.

Indeed, the price reduction was not only disclosed in the 10-Q, but it was also disclosed in an analyst conference call on July 29, 2004, ten days before the 10-Q was issued. The Company specifically stated that the Amended AWE Contract was "***at a lower margin***." (RJN, Ex. J at 7 (Dkt. 32)) (Transcript of the Q2 2004 StarTek Earnings Conference Call held on July 29, 2004.) While plaintiffs omitted this disclosure from the CC, they have now added it to the ACC at ¶ 31 ("defendants disclosed that the margin decrease was a result of a tiered pricing structure in the renewed [AWE] contract."). Based on this, it is no longer possible to dispute that the Company disclosed and quantified the price reduction in the Amended AWE Contract ten months before the end of the Class Period. Indeed, these disclosures were made in (and before) the 10-Q for the precise financial quarter when that amendment was entered. Therefore, this

4.

issue cannot give rise to a securities claim.

Finally, and perhaps most importantly, plaintiffs concede that when the August 9, 2004 disclosure was made, "StarTek stock did not fall" in response to the news. (ACC ¶ 35.) In fact, the first challenged stock drop in this case is alleged to have occurred on February 18, 2005 – six months after this disclosure. As a matter of law (and logic), a disclosure made on August 9, 2004 could not have proximately caused stock drops on February 18, 2005 and thereafter. (ACC ¶¶ 159, 176); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Indeed, when the price reduction was disclosed, StarTek's stock price increased. Further, none of the disclosures plaintiffs characterize as "corrective" – disclosures made on February 18, 2005, March 3, 2005, and May 6, 2005 – even remotely "correct" any statement about the Amended AWE Contract. Accordingly, plaintiffs have not even come close to pleading "loss causation" as to the Amended AWE Contract. *See Dura*, 544 U.S. at 346.

> **(2)     The Loss of the Microsoft SCM Business Was Disclosed and Did Not Cause a Stock Drop.**

Plaintiffs also attempt to avoid the February 17, 2004 disclosure by StarTek relating to the Microsoft SCM business:

> **The revenue we receive from Microsoft Corporation has declined in recent periods and we believe will continue to decline throughout 2004. If we are unable to replace this revenue, our business and results will be harmed.**
>
> *We expect that revenue we receive from Microsoft Corporation will continue to decline throughout 2004 and may become an insignificant portion of our revenue stream in subsequent years.*

(Dkt. 32, Ex. A, at 7; *see* Opp. at 8-9) (emphasis in original.) Plaintiffs quibble about the Company's statements that the Microsoft SCM business "**will continue to decline**" and that if the Company cannot "**replace this revenue**," the Company "**will be harmed.**" Plaintiffs base their claims about the SCM business solely on a confidential witness, "CW1," who states that management "absolutely knew" that Microsoft had changed from a fixed contract to a "Request

for Proposal" ("RFP") process, and that "it came up with discussions with Meade <u>about how to</u> <u>replace that revenue</u> . . . ." (Opp. at 9) (citing ACC ¶ 70) (emphasis added.)[3]

In the end, plaintiffs are engaged in hair-splitting. The securities laws do not create a drafting contest; they prohibit false and misleading statements. CW1's statement is consistent with exactly what the Company said. The Company's public statement was that the SCM revenue had declined, "**will continue to decline**," and "*[i]f we are unable to replace this revenue, our business and results will be harmed.*" (Dkt. 32, Ex. A, at 7.) Thus, the Company <u>specifically</u> said that the Microsoft revenue needed to be "replaced." Further, plaintiffs do not dispute that even though Microsoft changed to an RFP process – and even though StarTek was not selected for the initial RFP – CW1 does not state or even imply that StarTek could not compete for subsequent RFPs. In short, plaintiffs are merely fly-specking disclosures by the Company that were unquestionably accurate.

In any event, none of the alleged disclosures that plaintiffs identified as "corrective" – February 18, 2005, March 3, 2005, or May 6, 2005 – even remotely "corrected" any statements about the Microsoft SCM business. Accordingly, plaintiffs have failed to plead "loss causation." This is not an issue of insufficient proof. Rather, plaintiffs have failed to identify any stock drop that is attributed to "revelations" about the Amended AWE Contract or the Microsoft SCM business. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (under Rule 8(a), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level" to survive dismissal); *cf. Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (complaint must allege that "the defendant's misrepresentation . . . proximately caused

---

[3] Allegations from "confidential witnesses" should be viewed with skepticism. *See, e.g., Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("One upshot of the approach that *Tellabs* announced is that we must discount allegations the complaint attributes to five 'confidential witnesses'. . . . It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007)). In the instant case, CW1 purports to say what StarTek executives "absolutely knew" in 2004 even though CW1 left the Company in "late 2003." (ACC ¶ 58.)

6.

the plaintiff's economic loss"). This fundamental pleading defect violates *Dura* and its progeny, requiring dismissal of plaintiffs' Section 10(b) claim.[4]

> **C.** **The Section 10(b) Claim Against Toni Stephenson and Pam Oliver Should be Dismissed Because the Market Did Not Rely on Any Statement or Conduct by These Defendants.**

Toni Stephenson and Pam Oliver, the wife and sister of the Company's founder, were not directors or executive officers of the Company and are not alleged to have made any statement or engaged in any conduct on which the market relied. (Opp. at 9-13.) Plaintiffs argue that "conduct itself can be deceptive," (Opp. at 12) but that misses the point. "Regardless of whether the deceptive device is conduct or a written statement, it is actionable only when there is 'the requisite proximate relation to the investors' harm . . . . <u>Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.</u>'" *In re Nat'l Century Fin. Enter. Inc. Inv. Litig.*, --- F. Supp. 2d ---, 2008 WL 918708, at *5 (S.D. Ohio April 2, 2008) (quoting *Stoneridge*, 128 S. Ct. at 769) (emphasis added).

Plaintiffs do not allege that they **relied upon** any statements or conduct by Toni Stephenson or Pam Oliver. The only allegations against Toni Stephenson and Pam Oliver are that they were large stockholders and that they were the wife and sister of founder Emmet Stephenson. (ACC ¶ 1.) Plaintiffs have completely failed to allege the requisite element of reliance, mandating dismissal of the Section 10(b) claim against these defendants.

Plaintiffs assert that the Court found stock sales by Toni Stephenson and Pam Oliver to be suspicious and, therefore, supportive of scienter. (Opp. at 11) (citing Order at 26.) However, "scienter" is simply the <u>mental state</u> of individuals whose statements or conduct are alleged to be

---

[4] Plaintiffs attempt to distinguish *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007) and *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007). (Opp. at 27. n. 9, 29.) However, those cases, as well as others cited in the Opening Brief at 6-8, simply reaffirm the uncontroversial rule that to satisfy *Dura*, a stock drop must be attributable to an allegedly false or misleading statement. Here, the stock drops alleged in the ACC – on February 18, 2005, March 3, 2005 and May 6, 2005 – had absolutely nothing to do with the price reduction in the Amended AWE Contract or the decline in the Microsoft SCM business. *Dura*, 544 U.S. at 339.

misleading to the market (thereby inflating the stock's price). Thus, defendants often assert that a challenged statement was not deliberately false. In such situations, a finding of "scienter" shows that the defendant actually intended to dissemble. Thus, while a claim under Section 10(b) cannot exist without scienter, scienter is simply the mental intent to mislead the market by deceptive words or deeds. (Order at 16) (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003) (discussing elements of a Section 10(b) claim). "Reliance" by the market on those deceptive words or deeds is a separate "essential" element of a claim. *Stoneridge*, 128 S. Ct. at 769. In short, plaintiffs cannot state a claim against Toni Stephenson and Pam Oliver unless they made statements or engaged in deceptive conduct upon which the market relied. *See Stoneridge*, 128 S. Ct. at 761; *Dura*, 544 U.S. at 339.

Apparently recognizing this deficiency, plaintiffs conflate two separate and completely different concepts. Plaintiffs argue that even without market reliance on a statement or conduct, they can assert an insider trading claim against Toni Stephenson and Pam Oliver as "tipees." (Opp. at 11, n. 5.) This argument is fundamentally flawed. As a starting point, there are two different kinds of actions under Rule 10b-5:

- First, claims of "fraud-on-the-market," asserting that stockholders were harmed by a stock drop (like this case); and

- Second, government actions (and sometimes individual actions by "contemporaneous" traders) for insider trading in violation of Sections 20A and 10(b) of the Exchange Act.

In a class action for fraud-on-the-market such as the instant case – stemming from allegedly deceptive statements or conduct – plaintiffs absolutely must show that the market relied on the allegedly deceptive statements or conduct. *See, e.g., Adams*, 340 F.3d at 1095; *Stoneridge*, 128 S. Ct. at 761. In contrast, an insider trading claim is a different type of claim that can only be asserted by the government or by a "contemporaneous" trader, not a class of all purchasers. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999); *Evergreen Equity Trust v. Fannie Mae*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007). Thus, a claim for insider trading by a governmental

entity or a contemporaneous trader is completely different from a market-based stock drop case such as this case, which requires market reliance.[5]  Plaintiffs have blatantly conflated these two concepts.  On the face of the ACC, the purported class cannot bring a fraud-on-the-market claim against Toni Stephenson and Pam Oliver, since they did not say or do anything on which the market relied.  In short, because the ACC does not allege any statements or deceptive conduct by Toni Stephenson and Pam Oliver on which the market relied, the ACC does not state a claim against them for "fraud-on-the-market" under Section 10(b).  The Court should dismiss the Section 10(b) claim against Toni Stephenson and Pam Oliver with prejudice, since no amendment can change the fact that they had nothing to do with any statement or conduct on which the market relied.

   **D.     The Section 11 Claim Should Be Dismissed Because the ACC Fails To Comply With This Court's Order On "Tracing."**

   This Court's March 28, 2008 Order afforded plaintiffs leave to amend the Section 11 claim, provided that they could allege "tracing."  (Order at 15.)  Misleadingly, the Opposition asserts that plaintiffs purchased their shares "pursuant to and/or traceable to [StarTek's] materially false and misleading Registration Statement." (Opp. at 3.)  However, no such allegation of "traceability" appears in the ACC.  (ACC ¶ 45; ACC, *passim*.)  Instead, the relevant paragraph of the ACC only contains the conclusory and inherently speculative allegation that one plaintiff purchased its shares "pursuant to" the registration statement (since it purchased a few shares on the "same day" as the secondary offering).  (ACC ¶ 45.)  As shown below, because the secondary offering included only fungible shares that were identical to the shares already in the market, there is absolutely no way to tell if any purchaser received pre-existing shares or new shares.  Accordingly, plaintiffs have failed to allege that their shares are traceable to the

---

[5] The cases cited by plaintiffs in support of the claim against Toni Stephenson or Pam Oliver are inapposite because those actions were brought by the government, which, of course, may sue for insider trading irrespective of market reliance.  (Opp. at 11-12.)

registration statement.[6]  This inability to trace provides an independent ground for dismissal of the Section 11 claim.  (Order at 15 ("[P]laintiffs have failed to allege that their stock is traceable to the secondary offering.").)

Plaintiffs contend that "[t]racing can be established by alleging that the plaintiff purchased shares on the same day as the offering." (Opp. at 14.)  Such a pleading may be sufficient where there is a unique class of securities (e.g. "Class B" shares that could only have come from the secondary offering).  However, it is insufficient where, as here, the secondary offering introduced fungible, indistinguishable securities.  Every single case cited by plaintiffs on this point involved unique, distinguishable securities where there was no dispute about the source – i.e. securities that could only have been purchased from the challenged offering. (Opp. at 14) (citing *In re Metro. Secs. Litig.*, 532 F. Supp. 2d 1260, 1281 (E.D. Wash. 2007) (Section 11 claim involving distinguishable "Series B," "Series R & T," debentures "Series III and III-A," and "Series E-7" shares of preferred stock.); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007) ("Class A" shares and "Notes"); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (4.850% debt offering pursuant to the Registration Statement); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1371 (N.D. Ga. 2005)).

As discussed in the Opening Brief, where a new and distinguishable class or series of shares is issued, all holders of those new shares can inherently "trace" their purchase to the secondary offering.  (Op. Br. at 10); *see Joseph v. Wiles*, 223 F.3d 1155, 1159-60 (10th Cir. 2000) (plaintiff's shares could be traced to the allegedly defective registration statement "because [the Company] made *only one debenture offering*, [and therefore] the debentures [plaintiff] purchased [were] directly traceable to [that] offering and registration statement")

---

[6] Ordering shares "on the same day" as the secondary offering proves nothing.  Such a purchaser could easily have received some of the "at least 3 million shares issued prior to the 2004 secondary offering." (*See* Order at 12.)  These pre-existing shares were identical to the newly issued shares in all respects, including price.  More importantly, plaintiffs improperly bring this Section 11 claim on behalf of all purchasers who bought shares in the 26 months straddling the secondary offering, without tracing a single share to that offering.

(emphasis added); *Demaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003); *see also Lee v. Ernst & Young*, 294 F.3d 969, 976-77 (8th Cir. 2002). In contrast, in the instant case, it is not disputed that all StarTek's common stock was completely fungible, with a single uniform class of shares. (ACC ¶ 30.) Therefore, it is inherently speculative to claim that any particular purchase resulted in delivery of newly issued stock as opposed to pre-existing stock. By bringing a Section 11 claim on behalf of all purchasers of common stock in a 26-month period straddling the secondary offering – irrespective of whether those purchasers can "trace" their shares to the registration statement – plaintiffs have ignored this Court's admonition that they must allege tracing.

There will never be any way for a purchaser to trace a single share to the secondary offering, other than speculation. *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118 n.396 (S.D.N.Y. 2004) ("[T]he presence of identical shares that were traded before an offering and remain in the market after the offering forecloses the possibility of a section 11 class.") (internal citations omitted). <u>This does not leave any plaintiff without a remedy</u>. Rather, in cases such as this, where tracing is impossible, the law directs plaintiffs to Section 10(b) (if such a claim can be properly pled). *Klein v. Computer Devices, Inc.*, 591 F. Supp. 270, 273 n.7 (S.D.N.Y. 1984) ("If the purchaser bought identical securities already being traded on the open market, he must look elsewhere [not to Section 11] for relief."). For these reasons, the Section 11 Claim should be dismissed with prejudice.

## III.    CONCLUSION

For all the foregoing reasons, the ACC should be dismissed without leave to amend.

DATED:  July 17, 2008

Respectfully submitted,

s/ Koji F. Fukumura
*Koji F. Fukumura*
William E. Grauer
Mary Kathryn Kelley
COOLEY GODWARD KRONISH LLP
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone: (858) 550-6000
FAX: (858) 550-6420
Email:  kfukumura@cooley.com
Email:  grauerwe@cooley.com
Email:  mkkelley@cooley.com

Paul H. Schwartz
COOLEY GODWARD KRONISH LLP
380 Interlocken Crescent
Suite 900
Broomfield, CO  80021-8023
Telephone: (720) 566-4000
FAX: (720) 566-4099
Email: schwartzph@cooley.com

**Attorneys for Defendants StarTek, Inc., A.
Emmet Stephenson, Jr., William E. Meade,
Jr., Michael W. Morgan, Eugene L.
McKenzie, Jr., Pamela S. Oliver, Toni E.
Stephenson.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2008, I electronically filed the foregoing REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND THE PRIVATE SECURITIES LITIGATION REFORM ACT with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following attorneys of record at the listed email address:

| | |
|---|---|
| Anne Louise Box | anneb@csgrr.com |
| Edward P. Dietrich | edwarddietrich@aol.com |
| | edwarddietrich@dietrichandarleo.com |
| Henry Rosen | henryr@csgrr.com |
| Koji F. Fukumura | kfukumura@cooley.com |
| | chourani@cooley.com |
| James E. Nesland | neslandje@cooley.com |
| | foutsdl@cooley.com |
| | inghramjl@cooley.com |
| | calendarreq@cooley.com |
| Paul H. Schwartz | schwartzph@cooley.com |
| Kip Brian Shuman | KShuman@DyerShuman.com |
| | lcrisswell@dyershuman.com |
| Matthew M. Wolf | mwolf@allen-vellone.com |
| | tnovoa@allen-vellone.com |

s/ Shelley Williams
*Shelley Williams*
COOLEY GODWARD KRONISH LLP
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420
E-mail: shelley_williams@cooley.com