IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 05-cv-01265-WDM-MEH
(Consolidated with 05-cv-1344-WDM-MEH)

WEST PALM BEACH FIREFIGHTERS' PENSION FUND,
On Behalf of Itself, and All Others Similarly Situated,

    Plaintiff,

v.

STARTEK, INC., et al.,

    Defendants.

---

**ORDER ON MOTION TO DISMISS**

---

Miller, J.

This matter comes before me on Defendants' Motion to Dismiss (doc no 61), filed June 5, 2008. Plaintiff opposes the motion. Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, the motion to dismiss will be granted in part and denied in part.

Background

Much of the background of this securities fraud case was recited in full in my earlier Order on Motion to Dismiss (doc no 52), which concerned alleged deficiencies in a previously-filed complaint (doc no 25). The operative pleading at this time is Plaintiff's Amended Consolidated Complaint (doc no 60) ("ACC"), which remedies some of the pleading defects in the earlier complaint and contains additional allegations supporting the claims.

These consolidated cases, originally brought as two separate class actions on behalf of shareholders, allege securities fraud by corporate defendant StarTek, Inc. ("StarTek"), and the individual named defendants, A. Emmet Stephenson, William Meade, Michael Morgan and Eugene McKenzie, who at relevant times were officers and/or directors of StarTek, and Toni E. Stephenson and Pamela Oliver, who were major shareholders or controlled major shareholders of the company. The named Plaintiff alleges that it is a shareholder who purchased or otherwise acquired StarTek common stock at "artificially inflated prices" and suffered damages when the stock price fell.

The alleged securities fraud apparently arises from a series of events that occurred between February 26, 2003 and May 5, 2005 ("the class period"), including the issuance of press releases in 2003, the filing of a registration statement in February 2004, and subsequent amendments thereto which culminated in an offering of StarTek securities for sale in June 2004, and the publication of various public statements after the offering. According to Plaintiff, these activities concealed weak demand for the company's products and other problems, some of which ultimately came to light in March 2005 when the company announced substantial declines in its gross margins, and which resulted in a severe drop in the stock price by May 6, 2005 when the company announced a significant decline in its per share earnings. Plaintiff alleges that the individual Defendants took advantage of the artificially inflated stock price to sell their own shares at various times during the class period.

The previous consolidated complaint (doc no 25) contained the following claims: 1) violations of Section 11 of the Securities Act by Defendants Startek, Meade,

2

McKenzie, Stephenson and Morgan in connection with the filing of the registration statement, 2) violations of Section 15 of the Securities Act by all individual defendants as controlling persons, 3) violations of Section 10(b) of the Exchange Act and Rule 10b-5 by all defendants, and 4) violations of Section 20(a) of the Exchange Act by all defendants as controlling persons.

In my earlier Order (doc no 52), I concluded that the Section 11 and Section 15 claims should be dismissed without prejudice because the allegations did not show that the named plaintiffs could trace their shares to the registration statement and therefore lacked standing. I further determined that the Third and Fourth Claims for relief could proceed because the plaintiffs had adequately alleged facts showing material misrepresentations/omissions, resulting losses, and scienter. However, I concluded that the plaintiffs had not alleged facts showing that Defendants Toni Stephenson and Pamela Oliver exercised power or authority to cause StarTek to engage in the alleged unlawful conduct, and therefore they could not be liable as control persons under Section 20(a).

  1. <u>The Amended Consolidated Complaint</u>

The ACC, filed after my Order, contains essentially the same allegations regarding the course of conduct by StarTek and its principals and is again over 100 pages, much of it highly repetitive. It contains the same claims as those addressed in my previous Order, with the exclusion of Defendants Toni Stephenson and Pam Oliver as defendants in the Section 20(a) claim. Because the issues raised in this Motion to Dismiss require a somewhat different analysis than my previous Order, I will again review the basic chronology and alleged misrepresentations upon which Plaintiff's

claims are based.

StarTek is a provider of business process outsourced services, consisting of two broad areas: business process management ("BPM") and supply chain management services ("SCM"). ACC ¶ 47. BPM includes provisioning management, wireless telephone number porting, receivables management, wireless telephone activations, and high-end technical support and customer care services. *Id.* SCM includes packaging, fulfillment, marketing support, and logistics services. *Id.* In 2003, approximately 90% of StarTek's business came from four major customers: AT & T Wireless Services ("AWE"), Microsoft Corporation ("Microsoft"), T-Mobile, and AT & T Corporation. *Id.*

Plaintiff asserts that the class period should begin on February 25, 2003, at which time StarTek's stock was trading at $23. ACC at ¶ 2. On February 26, 2003, the company issued a press release in which Stephenson announced that two new facilities were being constructed because of the strong demand for StarTek's services. *Id.* at ¶ 12. Plaintiff contends this was false because StarTek knew the actual demand from its existing customers and had only a hope of new customers and increased demand. *Id.*

Plaintiff alleges that in early 2003, Microsoft notified StarTek that it would not be renewing its contract. ACC at ¶ 65. In 2002, Microsoft accounted for almost 90% of StarTek's SCM business, and approximately 34.4% of the total revenues. *Id.* at ¶ 67.

In late February 2003, the company issued its 2002 Annual Report, which Plaintiff contends contained numerous false or misleading statements, including that StarTek's recent management transition was largely complete and that the company was ready to move forward. ACC at ¶ 13. Plaintiff alleges this was misleading because

4

there was a great deal of turmoil in the sales department at the time, including problems retaining a Senior Vice President of Sales.[1]  *Id.*  Plaintiff alleges that StarTek did not disclose that many of the new management hires did not have industry experience.  *Id.* at ¶ 14.

Plaintiff further alleges that in May, August, and October 2003, StarTek issued press releases and announcements that again promoted the opening of the two new telecommunications facilities and the expectations of increased demand.  ACC at ¶¶ 17, 19.  This allegedly artificially inflated StarTek's stock price to $36 on August 18, 2003.  *Id.* at ¶ 2.  However, according to a confidential witness, identified as CW 1, by October 2003, the SCM pipeline was empty and StarTek had failed in its bid to land a new contract with Microsoft.  *Id.* at ¶¶ 68, 69.  Similarly, in a November 5, 2003 press release, Stephenson asserted that business grew in the last quarter, and that the two facilities had been opened to capture the expected growth.  StarTek's stock price increased to over $40 in December 2003.  *Id.* at ¶ 2.  Again, however, a confidential witness, identified as CW 2, relates that an order from a new contract signed with Verizon in October 2003 was immediately cancelled and delayed.  *Id.* at ¶ 73.[2]  Similarly, CW 2 asserts that in late 2003 and early 2004, StarTek was in the process of closing new call center service contracts with Qwest, T-Mobile, and Cricket, but that management knew in early 2004 that these contracts were not producing the revenue

---

[1]Plaintiff alleges other omissions as well; however, these alleged omissions relate to events that occurred in 2004, and so could not have been revealed at the time.

[2]According to another confidential witness, CW 4, no revenue was realized from the Verizon contract until 2005.  ACC at ¶ 81.

originally projected. *Id.* at ¶ 74. CW 3 further contends that there were few new contracts from 2001 to early 2004. *Id.* at ¶ 77.

Plaintiff alleges that the individual defendants conspired to undertake a large public offering of StarTek stock in order to reap the benefits of the inflated stock price before the disclosure of negative information concerning StarTek's business with AWE. ACC at ¶ 23. On February 17, 2004, StarTek filed a registration statement for a public stock offering of 3.2 million shares at a proposed maximum price of $39.82 per share and a proposed maximum aggregate value of $146.5 million to be received by the selling shareholders, and that the market responded favorably to the representations in the registration statement sending StarTek's stock up 5.3% to over $42 per share. *Id.* at ¶ 25. They also allege that in the registration statement defendants represented that "[f]or our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization." *Id.* According to Plaintiff, this statement was false or misleading because StarTek did not have high utilization rates. *Id.* Rather, Plaintiff allege that the company had a tremendous amount of excess capacity due to the fact that defendants opened four facilities on the mere hope that demand would materialize. *Id.*

Defendants point out that the registration statement also disclosed the loss of the Microsoft income. I will consider the full text of the registration statement without converting the motion to one for summary judgment. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is

6

referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss"). Specifically, the registration statement states the following:

> **The revenue we receive from Microsoft Corporation has declined in recent periods and we believe will continue to decline throughout 2004. If we are unable to replace this revenue, our business and results will be harmed.**
>
> * * *
>
> We expect that revenue we receive from Microsoft Corporation will continue to decline throughout 2004 and may become an insignificant portion of our revenue stream in subsequent years.

Declaration Of Koji F. Fukumura (doc no 32), Ex. A at 7 (bold typeface in the original). The same information was disclosed again on March 9, 2004 in the 2003 10-K Annual Report. Fukumura Decl. (doc no 32), Ex. B at 12.

After StarTek filed its registration statement, Cingular announced that it was acquiring AWE, which accounted for approximately 35% of StarTek's revenues. ACC at ¶ 26. Plaintiffs aver that because of the uncertainty of continued business after the Cingular acquisition, the StarTek stock price declined resulting in the postponement of the offering. *Id.* at ¶¶ 26-27. After the Cingular acquisition announcement, StarTek renegotiated its contract with AWE. In an amendment to its registration statement filed April 13, 2004, StarTek stated that the "term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause." *Id.* at ¶ 120. The same statement was repeated in amendments to the registration statement filed on May 18, 2004 and May 25, 2004, and

7

in a prospectus issued June 10, 2004. *Id.* at ¶¶ 124-26. According to Plaintiff, the amendments to the registration statement and all of Defendants' statements concerning the new contract with AWE were false or misleading because Defendants failed to disclose that StarTek was forced to drastically reduce its pricing in return for the contract extension. *Id.* at ¶ 27. The public offering occurred on June 9, 2004. *Id.* at ¶ 30.

As noted by Defendants, however, in a conference call on July 29, 2004, Defendant McKenzie did disclose the new tiered pricing program in the renegotiated AWE contract.[3] ACC at ¶ 31. He also asserted that the company planned to offset the lower rates by increasing productivity. *Id.* In the same call, Defendant Meade made representations about "ramping two new clients which were secured earlier this year" and the company's strong sales pipeline. *Id.* Again, Plaintiff claims these statements were false or misleading because in fact the sales pipeline was weak and the sales team was in disarray. *Id.* According to a confidential witness, around June 2004, he informed Defendant Meade of the loss of $11 million in anticipated revenue from T-Mobile. *Id.* at ¶ 87. This witness, CW 5, also alleges that McKenzie directed accounting changes in July 2004 to make it appear that StarTek had met revenue and earnings projections for the 2Q04 when in fact it had not. *Id.*

On November 4, 2004, the company issued a press release announcing disappointing results and authorizing a $25 million stock repurchase and dividend. ACC

---

[3]The tiered pricing structure was disclosed again in the 10-Q report, filed August 9, 2004. The stock did not go down at that time, but rather increased from $28.81 to $29.59 per share. Motion to Dismiss (doc no 61) at 3; ACC ¶ 35.

at ¶ 33. The loss in earnings was attributed to the lower rates in the AWE contract's tiered pricing structure. *Id.* Meade made statements in the press release and in a conference call on the same day expressing confidence in future growth, noting that the sales pipeline was strong and stating that although pricing was lower with the new AWE contract, it was "generating incremental volume." *Id.* at ¶ 35 He also discussed potential new customers, including a "health care company" and two new "telecom/utilities" clients. *Id.* at ¶¶ 82, 83. However, before the end of 2004, the health care company had withdrawn its bid. *Id.* at ¶ 82. Similarly, CW 4 asserts that the contracts with the two telecom companies "were no closer in November 2004 than they had been in the prior months of 2004," although they were eventually added as clients. *Id.* at ¶ 83.

On February 18, 2005, the company announced that Meade was resigning, which caused StarTek's stock to drop from $25.75 to $19.60 per share on the assumption that poor financial results were the reason for the resignation. ACC at ¶ 5.

On March 3, 2005, StarTek announced a decline in its earnings, attributing the losses to costs in launching the new call centers, decreases in revenue in the SCM business, and lower rates from the renegotiated AWE contract. ACC at ¶ 39. At a conference call that same day, the company's acting CEO stated that the company had expected higher sales volumes and more clients, but these did not materialize. *Id.* He also disclosed for the first time that a new head of sales was hired in October, who completely revamped the sales force in the fourth quarter. *Id.* The stock dropped to $18. *Id.* at ¶ 6. On May 6, 2005, the company again announced a fall in earnings, which was again attributed to the tiered pricing with AWE, the decline in SCM business,

and excess capacity. *Id.* at 40. On May 5, 2005, the last day of the class period, StarTek's stock was $12.40 per share. *Id.* at 41.

    2.    <u>Alleged False/Misleading Statements</u>

As I noted in my previous order, I will generally adopt Plaintiff's categorization of the alleged false and misleading statements, now set forth in the ACC, as relating to the following issues: 1) statements implying strong demand from the four main customers, in particular Microsoft and AWE; 2) statements representing that the company had a healthy sales pipeline; 3) statements indicating that management transitions were completed and successful; 4) statements implying strong demand for the company's services, particularly regarding the need for new facilities; and 5) omissions concerning pricing in the renegotiated contract with AWE. ACC at ¶¶ 2, 4.

In their Motion to Dismiss, Defendants argue that the complaint should be dismissed because the two primary alleged non-disclosures, the loss of the contract with Microsoft and the price reductions in the renegotiated AWE contract, were in fact disclosed. Because these risks were disclosed and the stock price did not fall at that time, Defendants argue that Plaintiff cannot plead "loss causation," an essential element of any Section 10(b) claim. Defendants further argue that Plaintiff's Section 11 claim fails because the named plaintiffs cannot trace their shares to the June 2004 public offering. Finally, Defendants argue that the Section 10(b) claim must be dismissed as asserted against Defendants Pam Oliver and Toni Stephenson on the grounds that they did not make or participate in any statements to the market.

<u>Standard of Review</u>

Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and the Private

Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.  My function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiffs' consolidated complaint alone is legally sufficient to state a claim for which relief may be granted. *Pirraglia v. Novell*, 339 F.3d 1182, 1187 (10th Cir. 2003).  In general, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. *Id*. Here, where defendants' motion also argues that the complaint fails to meet the standards of the PSLRA with respect to the claims asserted under Section 10(b) and Rule 10b-5, I must also consider the strict pleading requirements of that statute and the "inevitable tension" between it and the "customary latitude" granted plaintiffs under Rule 12(b)(6). *Id.*

## Discussion

1. Loss of income from Microsoft and AWE

Throughout the ACC, Plaintiff makes numerous references to the loss of income from Microsoft and the tiered pricing structure in the renegotiated AWE contract as material facts belying the company's positive statements about its business, particularly about the demand from current customers.  The Microsoft contract amounted to approximately 90% of StarTek's SCM business around the beginning of the class period, and AWE and Microsoft together comprised 70% of total corporate revenue.  In my previous Order, I agreed with Plaintiff that the alleged nondisclosure of the status of these contracts could be material and not protected as "forward looking" statements under the PLRSA.  Order (doc no 52) at 36.  Defendants argue that, as shown above, StarTek disclosed these changes in its business and such disclosures did not cause any

11

drop in stock price. In response, Plaintiff argues that Defendants never revealed the extent of the pricing reductions and so the disclosures were inadequate.

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiffs' complaint must contain allegations addressing the following five elements: (1) the defendant made an untrue or misleading statement of material fact; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Adams v Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). As further stated by the Tenth Circuit in *Adams*, Section 78u-4(b)(1) of the PSLRA requires plaintiffs to specify the statements by the defendants they allege were misleading, the reasons why the statements were misleading, and, if the allegations in their complaint are made upon information and belief, to state with particularity all facts supporting their belief that the statements were false or misleading. Section 78u-4(b)(2) of the statute requires that plaintiffs' allegations give rise to a strong inference of scienter. *Id.* at 1087.

Defendants argue that because investors were aware of the loss of the Microsoft income and the amended AWE contract terms long before the stock drops at issue, Plaintiff cannot demonstrate "loss causation" attributable to the disclosure of those facts. In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the United States Supreme Court made clear that a complaint alleging securities fraud must set forth facts showing a causal relationship between the plaintiff's losses and the defendant's misrepresentations (i.e., proximate cause). 544 U.S. at 345-46. The point of *Dura* is

12

that mere inflation of stock price is not sufficient to support a cause of action for securities fraud; there must be a relationship between the alleged misrepresentations or false information and losses resulting when the "true facts" of the defendant's business are revealed. *See, e.g., In re AOL Time Warner, Inc. Sec. Litig.,* 503 F.Supp.2d 666, 679 (S.D.N.Y. 2007) ("Without providing a nexus between the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation ....").

I agree with Defendants that Plaintiff has not alleged any false or misleading statement concerning the loss of the Microsoft income. Rather, the loss and its impact were fully disclosed in unmistakable terms in the February 2004 registration statement. Statements such as "The revenue we receive from Microsoft Corporation has declined in recent periods and we believe <u>will continue to decline</u>," "If we are unable to replace this revenue, <u>our business and results will be harmed</u>," and future income from Microsoft may become "<u>insignificant</u>" all make clear that this source of revenue was endangered. Fukumura Decl. (doc no 32), Ex. A at 7 (emphasis added). No stock price drops occurred in the aftermath of this disclosure; rather, the initial response to the registration statement drove stock prices up. Under the circumstances, I conclude that Plaintiff's claims cannot rest on the facts relating to the loss of the Microsoft contract.

With respect to the amended AWE contract, I conclude dismissal would not be appropriate on this basis. Defendants argue that stock prices dropped after the following disclosures: (1) the February 18, 2005 press release announcing Meade's resignation; (2) the March 3, 2005 announcement of disappointing earnings reports; and (3) the May 6, 2005 press release confirming disappointing earnings in the first quarter

13

of 2005. Motion to Dismiss (doc no 61) at 6. Defendants argue that these events did not "correct" any misrepresentations about the amended AWE contract, which had previously been disclosed. I disagree. As Plaintiff notes, although Defendants disclosed that the renegotiated AWE contract contained a tiered pricing structure, they did not disclose the extent of the price concessions. Moreover, a reasonable inference from the allegations is that Defendants downplayed the impact of the amended contract. *In re Take-Two Interactive Sec. Litig.,* 551 F.Supp.2d 247, 283 (S.D.N.Y. 2008) ("[L]oss causation may be premised on partial revelations that do not uncover the complete extent of the falsity of specific prior statements."). The announcement of reduced earnings in spring 2004, which were attributed in part to the pricing reductions in the AWE contract, could plausibly be considered to have shown the "true facts" about the effect of the new pricing structure.

Accordingly, I will grant this portion of the Motion to Dismiss with respect to the alleged statements or omissions regarding the loss of income from Microsoft but not statements or omissions concerning the new pricing structure in the AWE contract.

2. Tracing

As noted, in my previous Order, I granted Defendants' Motion to Dismiss the Section 11 claim because the plaintiffs did not expressly allege that their stock was purchased as part of the June 10, 2004 offering pursuant to the amended registration statement or could be traced thereto. Order (doc no 52) at 14. Plaintiff has remedied this pleading defect by affirmatively alleging that Lead Plaintiffs Wayne County Employees' Retirement System and West Palm Beach Firefighters' Pension Fund purchased StarTek common stock on June 9, 2004 in the public offering pursuant to the

14

registration statement. ACC at ¶ 45. Defendants now argue that these allegations are insufficient. Specifically, Defendants assert that if a company's stock was in the marketplace before a subsequent offering, no buyer can definitely prove that stock purchased on the day of a public offering is traceable to the offering, as opposed to the same type or class of stock already in the market. Because StarTek's stock was completely fungible, Defendants assert that neither Plaintiff nor any other buyer of stock can allege that their shares are traceable to the June 2004 secondary offering.

Because this is a motion to dismiss and I must make all favorable inferences in favor of Plaintiff, I conclude that Plaintiff has adequately alleged that its shares are traceable to the secondary offering under the law of this circuit. *Joseph v. Wiles*, 223 F.3d 1155, 1159-61 (10th Cir. 2000); *see also In re Qwest Comm'ns Int'l., Inc.*, 396 F.Supp.2d 1178, 1202 (D. Colo. 2004). Plaintiff may or may not have a problem of proof on this issue as this litigation proceeds, but I am unwilling to hold that a buyer in a secondary offering is automatically foreclosed from pursuing a Section 11 claim in the absence of further guidance from the Tenth Circuit or other persuasive authority.

3. Section 10(b) Claim against Toni Stephenson and Pam Oliver

Finally, Defendants argue that the Section 10(b) claim must be dismissed against Defendants Toni Stephenson and Pam Oliver because they did not make or participate in any of the allegedly misleading statements. Plaintiff alleges in the ACC that these defendants are large shareholders of StarTek and, together with Emmet Stephenson, own 66.3% of all of the company's stock and elect its Board. ACC at ¶ 1. Defendants argue that the recent decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* establishes that where a defendant did not participate in the allegedly false

15

and misleading statements, there can be no liability under Section 10(b). 128 S. Ct. 761 (2008).

I disagree. Defendants overstate the holding of *Stoneridge*. In that case, the United States Supreme Court made clear that a Section 10(b) claim cannot be asserted against "aiders and abettors" of a company's fraud. *Stoneridge*, 128 S. Ct. at 769. Rather, for a secondary actor to be liable, that party's conduct must satisfy all the elements of liability for a Section 10(b) claim, including reliance by the plaintiff upon the defendant's deceptive acts. *Id*. The Court expressly notes that there is a rebuttable presumption of reliance "if there is an omission of a material fact by one with a duty to disclose." *Id*. The respondents in *Stoneridge* were customers participating in a scheme designed to inflate the company's revenues; the Court determined that they had no duty to disclose and their deceptive acts were never communicated to the public. *Id*. Therefore, the petitioner could not show reliance upon the respondents' acts. Here, by contrast, Plaintiff alleges that Defendants Toni Stephenson and Pam Oliver were StarTek insiders with a duty to disclose all material information. These allegations are sufficient to state a claim against these defendants.

Accordingly, it is ordered:

1. Defendants' Motion to Dismiss (doc no 61) is granted in part and denied in part. Any delay in disclosing the loss of income from Microsoft does not give rise to liability because the facts were disclosed and no losses resulted from any alleged misrepresentation, false statement, or omission

regarding this aspect of StarTek's business.  All other claims remain pending.

DATED at Denver, Colorado, on November 6, 2008.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge