## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01265-WDM-MEH
(Consolidated with 05-cv-01344-WDM-MEH)

WEST PALM BEACH FIREFIGHTERS' PENSION FUND,
On Behalf of Itself and All Others Similarly Situated,

      Plaintiff,

v.

STARTEK, INC., et al.,

      Defendants.

---

## UNOPPOSED MOTION FOR PRELIMINARY APPROVAL

## OF CLASS ACTION SETTLEMENT

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ...........................................................................1

II.   PROCEDURAL HISTORY.................................................................................2

III.  SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS.................................3

IV.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL............9

      A.   The Settlement Is Within the Range of Possible Approval ......................................9

      B.   The Method of Notice Is Proper .........................................................................11

V.    CERTIFICATION OF THE CLASS IS PROPER ............................................12

VI.   PROPOSED SCHEDULE OF EVENTS..........................................................15

VII.  CONCLUSION...................................................................................................16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amoco Prod. Co. v. Federal Power Comm'n,*
    465 F.2d 1350 (10th Cir. 1972) ....................................................................................9

*Armstrong v. Bd. of Sch. Dirs.,*
    616 F.2d 305 (7th Cir. 1980) .....................................................................................10

*Big O Tires, Inc. v. Bigfoot 4x4, Inc.,*
    167 F. Supp. 2d 1216 (D. Colo. 2001)..........................................................................9

*DeJulius v. New Eng. Health Care Employees Pension Fund,*
    429 F.3d 935 (10th Cir. 2005) ...................................................................................12

*Esplin v. Hirsch,*
    402 F. 2d 94 (10th Cir. 1968) ....................................................................................15

*In re Ribozyme Pharms., Inc. Sec. Litig.,*
    205 F.R.D. 572 (D. Colo. 2001) .....................................................................13, 14, 15

*Lucas v. Kmart Corp.,*
    234 F.R.D. 688 (D. Colo. 2006) .................................................................................10

*Rutter & Wilbanks Corp. v. Shell Oil Co.,*
    314 F.3d 1180 (10th Cir. 2002) .................................................................................10

## STATUTES, RULES AND REGULATIONS

Local Rule 7.1(A) ..........................................................................................................1

Federal Rules of Civil Procedure
    Rule 23 ......................................................................................................................12
    Rule 23(a)..........................................................................................................13, 14
    Rule 23(a)(1) .............................................................................................................13
    Rule 23(a)(2) .............................................................................................................13
    Rule 23(a)(3) .............................................................................................................13
    Rule 23(a)(4) .............................................................................................................14
    Rule 23(b) ..........................................................................................................13, 14
    Rule 23(b)(3).............................................................................................................14
    Rule 12(b)(6)...............................................................................................................2

**Page**

Rule 23(e)............................................................................................................................9
Rule 23(e)(2)........................................................................................................................9

15 U.S.C.
    §78j(b)...........................................................................................................................2
    §78t(a)...........................................................................................................................2
    §77k..............................................................................................................................2
    §77o..............................................................................................................................2


**SECONDARY AUTHORITIES**

4 Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)
    §11:25 .........................................................................................................................10

## I.    PRELIMINARY STATEMENT

Lead Plaintiff, the Wayne County Group (consisting of West Palm Beach Firefighters'

Pension Fund, Wayne County Employees' Retirement System, Anthony Zigmont, and Stewart L.

Horn), has reached an agreement to settle this putative class action with defendants StarTek, Inc.

("StarTek" or the "Company"), A. Emmet Stephenson, Jr., William E. Meade, Jr., Michael W.

Morgan, Eugene L. McKenzie, Jr., Toni E. Stephenson, and Pamela S. Oliver ("Defendants") for

$7,500,000 in cash (the "Settlement Fund"). Upon preliminary approval of the proposed settlement

by the Court, the Settlement Fund will be deposited into an interest-bearing escrow account within

fifteen business days, and, after final approval of the proposed settlement and completion of claims

administration, will be distributed pursuant to the terms of the Stipulation of Settlement dated as of

May 27, 2009 ("Stipulation"), submitted herewith.

This unopposed motion is submitted in support of Lead Plaintiff's request for an entry of an

Order Preliminarily Approving Settlement and Providing for Notice ("Notice Order") (the form of

which is submitted herewith) that (i) preliminarily approves the settlement and Stipulation; (ii)

certifies a class (the "Class") consisting of all persons (and their beneficiaries) who purchased

StarTek common stock between February 26, 2003 and May 5, 2005 (the "Class Period"); (iii)

authorizes the form and manner of notice to be provided to Class Members; and (iv) schedules a

hearing to consider final approval of the settlement, the Plan of Allocation of the settlement

proceeds, and an award to plaintiffs' counsel of attorneys' fees and Lead Plaintiff's and plaintiffs'

counsel's expenses. Pursuant to Local Rule 7.1(A), Plaintiffs' Lead Counsel state that Defendants

consent to the relief requested in this motion.

## II.    PROCEDURAL HISTORY

This litigation was commenced on July 8, 2005. Lead Plaintiff filed its Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") on May 19, 2008. In the Complaint, Lead Plaintiff alleges violations of Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants, on behalf of themselves and all persons who purchased StarTek common stock between February 26, 2003 and May 5, 2005.

Defendants moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on May 23, 2006. On March 28, 2008, this Court granted Defendants' motion to dismiss the two 1933 Act claims without prejudice, denied Defendants' motion to dismiss (without prejudice) the Section 10(b) claims, and denied dismissal of the Section 20(a) claims for each individual defendant except for Toni Stephenson and Pamela Oliver. *See* Doc. # 52. Lead Plaintiff thereafter filed the Complaint to address certain of the Court's concerns, to which Defendants filed a second motion to dismiss on June 5, 2008. Doc. # 61. This Court ruled on Defendants' second motion to dismiss on November 6, 2008. In its opinion, the Court reaffirmed that that all claims not previously dismissed by the Court would remain pending, that the two 1933 Act claims had been cured of their pleading defects and were now able to proceed, but that the allegations relating to any delay in disclosing the loss of income from Microsoft would not give rise to liability. *See* Doc. # 69.

Thereafter, the parties began exploring the possibility of a resolution of this action. They agreed on an experienced securities mediator—Jed Melnick with JAMS—to mediate the case. On May 18, 2009, the parties and their attorneys, along with Defendants' insurers, participated in a

-2-

mediation session in San Francisco, California, where they agreed to settle this case for $7.5 million, subject to the preparation of a definitive stipulation of settlement and the Court's approval.

## III.    SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS[1]

StarTek is a provider of business process outsourced services, which consist of business process management ("BPM") and supply chain management ("SCM") services. ¶47.[2] Defendant A. Emmet Stephenson, Jr. ("Stephenson") co-founded StarTek in 1987 with defendant Michael W. Morgan ("Morgan"). ¶¶48,50. Stephenson has served as the Company's Chairman of the Board since its formation. ¶48.

Throughout the Class Period, Defendants are alleged to have knowingly issued false or misleading statements about StarTek's business condition and operations. For example, on February 26, 2003, the start of the Class Period, Defendants issued a press release stating: "This month we have announced the opening of two new facilities . . . to handle growing demand for our superior outsourced services . . . the demand for this additional capacity brightens the outlook for more growth in future quarters." ¶101. As the Class Period progressed, Defendants continued to tell investors that they were "adding new capacity for identifiable client demand" (¶103) and that "[d]emand . . . now appears to be larger than we previously expected" (¶108), requiring the opening of even more new facilities. Defendants assured investors that StarTek "leveraged capacity very, very effectively" and was "not in a . . . we will build and hope they come type of environment. . . .

---

[1]    Lead Plaintiff stresses that these are its allegations. Defendants have denied and continue to deny all of them.

[2]    All "¶__" or "¶¶__" references are to the operative Complaint. *See* Doc. # 60.

[B]ecause of our conservative nature . . . you could be pretty much assured that somewhere right behind that there is a client in the pipeline." ¶12.

Lead Plaintiff alleged that, contrary to Defendants' statements, StarTek was opening new facilities not to service existing demand for current customers, but in the hope that demand would materialize in the future. ¶12. Lead Plaintiff claimed that, by the start of the Class Period, Defendants knew that there was not sufficient future demand from existing customers to fully utilize these new facilities. ¶12. Defendants also allegedly knew that potential new customers would not create this purported "demand."

Defendants also made allegedly false or misleading statements about the Company's management restructuring. For example, defendants Meade and Stephenson explained in StarTek's 2002 Annual Report, distributed in late February 2003, that "[t]he management transition, redirection, and refocus is largely complete. The new team is in place to implement against our strategic plan, and we are optimistic about our potential." ¶13. In addition, Defendants told investors on February 26, 2003, that "[o]ur new management team has been in place during this period and deserves full credit for these good results." ¶101.

However, StarTek's management transition was not largely complete and, in fact, its sales force was in disarray. ¶¶13-15. For instance, just prior to the beginning of the Class Period, defendant Meade fired the Senior Vice President ("SVP") of Sales for BPM, Michael Burke. *Id.* Meade then served as Acting SVP of Sales for several months until hiring Blake Willardsen for this position around June 2003. *Id.* Willardsen remained in this position until April 2004, after which Defendants did not hire a new SVP of Sales until October 2004. As a result, the BPM Sales

division, on which the Company heavily relied to generate new accounts and corresponding revenues, had no leadership during the second and third quarters of 2004. *Id.*

In addition to the executive management restructuring, Meade's restructuring efforts also involved dividing the sales organization into two divisions: Client Services and Sales. ¶16. Sales was responsible for generating new contracts with new clients and, after the contract was signed, Client Services handled contract implementation with the clients. *Id.* This restructuring allegedly led to confusion and dissatisfaction among customers and several confidential witnesses viewed it as a detriment to the Company's overall sales performance. *Id.* Indeed, the restructuring allegedly ultimately caused StarTek to lose a contract with TXU in September 2004, less than six months after securing it. *Id.*

Lead Plaintiff alleged that Defendants did not disclose these problems to investors and that, as a result of the concealment of StarTek's internal woes, StarTek's stock price was inflated from $23/share at the start of the Class Period to over $36/share on August 18, 2003. ¶18.

Additionally, Defendants allegedly continued to falsely tout the strength of StarTek's business. In October 2003, Defendants represented that "to handle increased demand from its targeted markets," StarTek had opened several new telecommunication facilities. ¶19. On November 3, 2003, Defendants again stated that "[d]emand for these services now appears to be larger than we previously expected, which requires opening a fourth new facility this year to keep up." ¶108. According to internal sources, however, the strong demand that Defendants claimed was not materializing. For example, Verizon Wireless ("Verizon") signed a contract with StarTek for 400 seats in a new call center in October 2003, only to cancel the entire order by early November 2003. ¶¶73,81. StarTek announced in early November 2003 that this call center was "open," but did

not disclose until March 2004 that its operations had been delayed until February 2004. ¶73. Instead, on November 5, 2003, Defendants reassured investors that "StarTek's business grew significantly during the September quarter as previously opened facilities ramped up on time and within budget." ¶110. In fact, business was so good, Defendants said, that StarTek was "opening two more facilities." *Id.* Defendants' positive statements sent StarTek's stock price soaring to over $40/share in December 2003. ¶112.

In early 2004, rumors began to circulate that Cingular was planning to acquire StarTek's biggest client, AT&T Wireless Services, Inc. ("ATT"), which accounted for 38% of StarTek's revenue. ¶20. If so, Cingular would be free to cancel the ATT contract with StarTek. *Id.* Lead Plaintiff alleged that the possible loss of this contract, along with the excess capacity and depressed demand for StarTek's services, posed a significant danger to StarTek's earnings. ¶¶21-23.

Shortly after StarTek filed a Registration Statement for a public offering of its stock for the benefit of certain of the Individual Defendants, Cingular announced that it was acquiring ATT. ¶27. In order to salvage the offering, StarTek renegotiated its contract with ATT. Defendants told investors that StarTek's contract with ATT was extended until December 31, 2006, and was not subject to termination for convenience or without cause. ¶27. Defendants did not disclose, however, that StarTek had drastically reduced its pricing in return for the contract extension. ¶¶27,71,80.

On May 5, 2004, Defendants told investors that "we are very pleased with the results for the first quarter of 2004 in which revenue growth accelerated as we more fully utilized the new . . . capacity we added last year." ¶¶29, 122. Defendants also announced a new utility client, referring to TXU. ¶122. StarTek secured the TXU contract in March 2004 but, undisclosed to investors, StarTek lost the TXU contract in September 2004, less than six months after it was secured. ¶99.

- 6 -

On a July 28, 2004 conference call, Defendants stated that "[w]e continue to be encouraged by the activity in our sales pipeline" and "are encouraged by our recent close rates and the size of our sales pipeline." ¶31. Moreover, Defendants stated that they were "currently in the middle of ramping two new clients" and were "very pleased with the ongoing positive response from both our existing clients and our newer clients and that they continue to reward us with more of their business." *Id.* In reality, however, from mid- to late-2001 through early 2004, there were only two or three new customer contracts, and the rest of StarTek's call center revenues came from existing customers. ¶77.

On November 4, 2004, StarTek announced disappointing results for the third quarter of 2004. ¶¶33,145. Defendants explained that the Company's gross margin had decreased due, in part, to the "incentive tiered-price reduction" in the ATT contract and to "investments in launching an additional facility." ¶145. However, defendant Meade reassured investors that "the pipeline is the strongest its been since I've been CEO . . . and we feel good about the incremental revenue that will be coming from new signings." ¶¶35,146. Defendants also touted a new health care customer, referring to McKesson. *Id.* Defendants, however, did not disclose that StarTek had lost the TXU contract in September 2004. ¶99.

Lead Plaintiff alleged that, in early January 2005, information that StarTek's fourth quarter would be weak and that the Company's sales pipeline was not as strong as investors were led to believe began to leak into the market, resulting in a stock price decline. ¶36. Analysts reported three investor concerns: "(1) that 4Q will be weaker than expected; (2) that [StarTek] was not able to secure the 3 RFPs [Request for Proposals] in the 4Q pipeline; and/or (3) that [Startek] will not be able to offset a potential decline in [ATT] revenue and meet '05 Street estimates & dividend

payments." ¶36. Defendants, however, denied any problems and responded that "[t]he new client pipeline heading into '05 looks encouraging." ¶¶37, 156. Defendants failed to mention, however, that, in addition to the TXU contract loss, StarTek had also lost the contract with McKesson in December 2004. ¶¶36,82. Then, after weeks of denying any problems, on February 18, 2005, StarTek announced the resignation of its CEO, defendant Meade. ¶38. StarTek's stock price dropped nearly 30% in the following few days. *Id.*

The market's fears were realized on March 3, 2005, when StarTek announced a decline in gross margin of 9.7%. ¶39. Defendants attributed the decline to "greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted." *Id.* Defendants admitted that "[w]e launched three new call centers in anticipation of a lot greater volume . . . [t]hat didn't materialize." Additionally, when questioned about StarTek's "healthy" pipeline, Defendants admitted, for the first time, that they had "hired a new head of sales in October, who completely revamped the sales force during the course of the fourth quarter, and during the course of January" and that they "cannot announce any clients today." ¶39.

Finally, on May 6, 2005 (the day after the end of the Class Period), StarTek announced a decrease in revenues and earnings per share for the first quarter 2005. ¶40. Defendants admitted that the "tiered pricing incentives and reduced supply chain volume" accounted for the majority of the decrease. *Id.* Defendants also admitted that "[t]he sales team that's in place today is still fairly new. Most of them came on board [in the] November, December, January time frame." *Id.* Moreover, Defendants admitted that there was "excess capacity" throughout the Company. *Id.* On this news, in addition to earlier price declines, StarTek's stock price fell over 18% to $12.40. ¶41.

## IV.     THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.     The Settlement Is Within the Range of Possible Approval

Courts strongly favor settlement as a method for resolving disputes. *See Amoco Prod. Co. v. Federal Power Comm'n*, 465 F.2d 1350, 1354 (10th Cir. 1972). This is especially true in complex actions such as this. *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F. Supp. 2d 1216, 1229 (D. Colo. 2001).

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of the compromise of claims brought on a class basis. At the *final* approval hearing, the Court will have before it extensive papers submitted in support of the proposed settlement and will be asked to make a determination as to whether the settlement is fair, reasonable, and adequate under all of the circumstances. *See* Fed. R. Civ. P. 23(e)(2). At this juncture, however, the parties request only that the Court grant *preliminary* approval of the settlement.

The procedure for review of a proposed class action settlement is well established:

> District court review of a class action settlement proposal is a two-step process. The *first step* is a *preliminary, pre-notification hearing* to determine whether the proposed settlement is "within the range of possible approval." This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. *Manual for Complex Litigation* § 1.46, at 53-55 (West 1977). If the district court finds a settlement proposal "within the range of possible approval," it then proceeds to the *second step* in the review process, the *fairness hearing*. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard. The goal of the fairness hearing is "to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is 'fair, reasonable, and adequate.'" *Manual for Complex Litigation* at 57. On the basis of all information available to him, the trial judge must decide whether or not to approve the proposed settlement.

- 9 -

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980) (emphasis added; footnote omitted); *accord* 4 Herbert B. Newberg, *Newberg on Class Actions* §11:25, at 38 (4th ed. 2002).

The parties are requesting the Court to take the first step in this process and "determine whether there is any reason not to notify the class members of the proposed settlement and to proceed with the fairness hearing." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006). The proposed settlement here satisfies the standard for preliminary approval because it is "'within the range of possible approval.'" *Armstrong*, 616 F.2d at 314 (citation omitted). The settlement is very beneficial to the Class under the circumstances, providing the sum of $7.5 million (less Court-awarded fees and expenses) to compensate Class Members for their allowed losses in StarTek common stock. Given the difficulties of this litigation, the complexities of proving certain elements of Lead Plaintiff's claims (such as Defendants' scienter and loss causation), and the continued risks if the parties were to proceed toward trial, the settlement represents a reasonable resolution of this action and eliminates the risk that the Class might otherwise recover nothing.

Moreover, reference to factors considered by courts in granting final approval of class action settlements lends further support to the proposition that this settlement is well within the range of possible approval. *See Lucas*, 234 F.R.D. at 693 (citing *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002)) (on preliminary approval motion, considering (i) whether the settlement was fairly and honestly negotiated, (ii) if serious questions of law and fact placed the outcome of the litigation in doubt, (iii) whether the value of an immediate recovery outweighed the mere possibility of a later recovery, and (iv) the judgment of the parties that the settlement is fair and reasonable).

First, the terms of the proposed settlement are the product of arm's-length negotiations with the assistance of an experienced and respected mediator, Jed Melnick. Second, Lead Plaintiff faced significant challenges that placed the ultimate success of this litigation in doubt. Defendants contend, among other things that (1) Lead Plaintiff would not be able to show that the Class' losses were proximately caused by the alleged misstatements and omissions; (2) any record developed on discovery would not permit Lead Plaintiff to carry its burden of proving that Defendants, with intent to mislead or recklessness, concealed material facts or made material misrepresentations; and (3) in any event, Lead Plaintiff would not be able to prove damages. Third, because of these immediate and continued risks, along with the significant amount of time it would take to achieve a final judgment if Lead Plaintiff were entirely successful, the value of a $7.5 million immediate recovery outweighs the mere possibility of a higher recovery years from now. Finally, it is Plaintiffs' Lead Counsel's informed opinion that, given the uncertainty and further substantial expense of pursuing this action through trial, the proposed settlement is fair, reasonable, and adequate, and in the best interests of the Class.

## B.     The Method of Notice Is Proper

As part of the preliminary approval process, the Court is also requested to approve the method of providing notice of the settlement to the Class. The Notice Order submitted herewith provides that Plaintiffs' Lead Counsel will cause the Notice of Pendency and Proposed Settlement of Class Action and the Proof of Claim and Release form ("Notice") to be mailed to all Class Members who can be identified with reasonable effort. In addition, a summary notice ("Summary Notice") will be published in *Investor's Business Daily*. This proposed method of giving notice (similar if not identical to the method used in countless other securities class actions) is appropriate because it

- 11 -

provides a fair opportunity for Class Members to obtain full disclosure of the conditions of the settlement. *See DeJulius v. New Eng. Health Care Employees Pension Fund*, 429 F.3d 935, 943-45 (10th Cir. 2005).

The Notice will advise Class Members of the essential terms of the settlement, set forth procedures for requesting exclusion from the Class or objecting to the settlement, and will provide specifics on the date, time, and place of the final settlement approval hearing. Thus, the Notice provides the necessary information for Class Members to make an informed decision regarding the proposed settlement. The Notice also contains information regarding plaintiffs' counsel's fee and expense application and the proposed plan for allocating the settlement proceeds among Class Members. Plaintiffs' Lead Counsel believe the Notice fairly apprises class members of their rights with respect to the settlement and therefore is the best notice practicable under the circumstances and should be approved by the Court. *See DeJulius*, 429 F.3d at 943-45.

## V.    CERTIFICATION OF THE CLASS IS PROPER

Lead Plaintiff further requests that the Court certify a Class consisting of all persons (and their beneficiaries) who purchased StarTek common stock during the Class Period, exclusive of Defendants, certain officers or directors of StarTek, members of Defendants' immediate families, any corporation, trust or other entity in which any Defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded person. Also excluded from the Class are those persons and entities who timely and validly request exclusion from the Class.

Certification of the Class will further the interests of the Class Members and Defendants; Defendants have stipulated to certification for settlement purposes only. For settlement purposes, the parties agree this action meets the requirements of Federal Rule of Civil Procedure 23. Class

- 12 -

certification for settlement purposes is appropriate here because the four prerequisites of Rule 23(a) are met, and the requirement of subdivision of Rule 23(b) is satisfied.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. The numerosity requirement is easily satisfied here: StarTek had millions of shares traded during the Class Period. The proposed Class of investors who purchased StarTek common stock during the Class Period contains at least hundreds, if not thousands of persons. Although no bright line numerical test applies, when class size reaches substantial proportions the numerosity requirement is usually satisfied by this magnitude of numbers. *See In re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572, 578 (D. Colo. 2001) (the numerosity requirement is assumed to be satisfied in the case of a nationally traded security).

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." This case presents several common issues of law and fact, including whether Defendants (a) publicly misrepresented and/or omitted material facts concerning StarTek's financial position and sales pipeline; (b) acted with scienter in making such misrepresentations or omitting such facts; and (c) caused StarTek common stock to trade at artificially inflated prices. Where, as here, the allegations of wrongdoing involve a common course of conduct, Class Members' claims will clearly involve common questions of law and fact. *See Ribozyme*, 205 F.R.D. at 578 (noting Rule 23(a)(2) "does not require that the injuries of all class members be identical; 'only the harm complained of must be common to the class'") (citation omitted).

Rule 23(a)(3) requires that plaintiffs' claims be typical of the class's claims. Here, the Lead Plaintiff's claims are typical because "the claims brought by the Lead Plaintiff[] arise out of the

same course of conduct by Defendants and rest on exactly the same legal theory, securities fraud, as those of the potential class members." *Ribozyme*, 205 F.R.D. at 578.

Rule 23(a)(4) requires that the plaintiffs fairly and adequately protect the interests of the class. This requirement is comprised of two factors: (1) that the class representatives' attorneys are qualified, experienced, and generally able to conduct the litigation; and (2) that the suit is not collusive, and plaintiffs' interests are not antagonistic to those of the other members of the class. *Ribozyme*, 205 F.R.D. at 578. Lead Plaintiff has retained counsel who have already been appointed Lead Counsel by the Court, and who are qualified, experienced, and able to conduct the litigation. Doc. # 19; *see Ribozyme*, 205 F.R.D. at 578 (that a court has already made a determination appointing proposed class representative as Lead Plaintiff and its counsel as Lead Counsel supports the conclusion that the adequacy prong is met). Plaintiffs' Lead Counsel have extensive experience in securities class action litigation and have successfully prosecuted numerous class actions in this District and throughout the country. In addition, there is no antagonism between the Lead Plaintiff and the Class. Lead Plaintiff and all Class Members have allegedly been subjected to the same course of conduct by Defendants.

A class action must also satisfy one of the subdivisions of Rule 23(b). Rule 23(b)(3) provides:

> (b) *Types of Class Actions.* A class action may be maintained if Rule 23(a) is satisfied and if:
>
> * * *
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating of the controversy.

- 14 -

Here, common questions of law or fact predominate over any question affecting only individual Class Members. Where, as here, plaintiffs allege that the defendants engaged in misrepresentations or omissions causing inflation in the price of stock, which is alleged to violate the federal securities laws, the issues of law and fact that flow from these activities predominate over any individual issue in a class action. *See Ribozyme*, 205 F.R.D. at 578-79 (common issues predominate where the question of the defendants' liability is common to all class members). A class action also is superior to other methods of adjudication. The class action device is particularly appropriate for addressing claims of violations of the securities laws. *See Esplin v. Hirsch*, 402 F. 2d 94, 99 (10th Cir. 1968). As in this case, such claims typically involve a large number of investors who are geographically dispersed, and whose relatively small claims make it prohibitively expensive to seek recovery through individual litigation. *See Ribozyme*, 205 F.R.D. at 579.

Accordingly, Lead Plaintiff requests that the Court certify the Class for settlement purposes only.

## VI.    PROPOSED SCHEDULE OF EVENTS

In connection with preliminary approval of the settlement and the signing of the Notice Order, the Court must set dates for mailing of the Notice and publication of the Summary Notice, the filing of supporting briefs, deadlines for requesting exclusion from the Class, objecting to the settlement, and submitting claim forms. The Court must also set the date of the final settlement hearing. The parties suggest a schedule based on the following time intervals:

| Event | Proposed/Approximate Timing |
|---|---|
| Notice mailed to Class ("Notice Date") | Within ten (10) days after the Notice Order is signed |

| Event | Proposed/Approximate Timing |
|---|---|
| Summary Notice published | Within ten (10) days after the Notice Date |
| Briefs in support of settlement approval, plan of allocation, and fee and expense request due | Within twenty (20) days after the Notice Date |
| Deadline for exclusion from the Class, for objections to the settlement, plan of allocation or fee and expense request | Forty (40) days after the Notice Date |
| Replies to any objections due | Fifty-five (55) days after the Notice Date |
| Settlement Hearing | Seventy (70) days after the Notice Date |
| Deadline for submitting Proof of Claim and Release forms | One hundred twenty (120) days after the Notice Date |

## VII.    CONCLUSION

For all of the foregoing reasons, Lead Plaintiff submits that the proposed settlement is a fair

and reasonable compromise of the issues in dispute and warrants this Court's preliminary approval.

DATED:  September 3, 2009                         Respectfully submitted,

KIP B. SHUMAN
THE SHUMAN LAW FIRM
885 Arapahoe Blvd.
Boulder, CO  80302
Telephone:  303/861-3003
303/830-6920 (fax)
E-mail: kip@shumanlawfirm.com

Liaison Counsel

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
KEITH F. PARK
HENRY ROSEN
ANNE L. BOX
STACEY M. KAPLAN


                        s/ Keith F. Park
                        KEITH F. PARK

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SARAH R. HOLLOWAY
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

DIETRICH & ARLEO
EDWARD P. DIETRICH
850 Main Street, Suite 201
Ramona, CA 92065
Telephone: 760/789-8000
760/789-8081 (fax)

Co-Lead Counsel for Plaintiffs

S:\Settlement\Startek.set\V1 BRF PREL APPROVAL 00060945.doc

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3, 2009.

s/Keith F. Park
KEITH F. PARK

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: keithp@csgrr.com

CM/ECF - U.S. District Court:cod                                                    Page 1 of 2

# Mailing Information for a Case 1:05-cv-01265-WDM-MEH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Anne Louise Box**
  anneb@csgrr.com,hectorm@csgrr.com,e_file_sd@csgrr.com

- **Edward P. Dietrich**
  edwarddietrich@aol.com,edwarddietrich@dietrichandarleo.com

- **Robert J. Dyer , III**
  bob@dyerberens.com

- **Koji F. Fukumura**
  kfukumura@cooley.com,chourani@cooley.com

- **Sarah Renee Holloway**
  sholloway@csgrr.com,hectorm@csgrr.com

- **Stacey Marie Kaplan**
  skaplan@csgrr.com,hectorm@csgrr.com

- **James E. Nesland**
  neslandje@cooley.com,pcarter@cooley.com,calendarreq@cooley.com,inghramjl@cooley.com

- **Henry Rosen**
  henryr@csgrr.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com,lisa@shumanlawfirm.com

- **Jeffrey Allen Smith**
  jsmith1@cooley.com,pcarter@cooley.com,calendarreq@cooley.com,inghramjl@cooley.com

- **Matthew M. Wolf**
  mwolf@allen-vellone.com,tnovoa@allen-vellone.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)